Peter CRAWFORD; Frederick J. Adam; Robert F. Brauman; Richard L. Brown; William A. Burbage; Robert Erchak; Ron E. Merzlak; Leroy Rogers; Roger F. Seely; Warren Wells; Dale Cross; Richard Pederson; Clyde B. Smith; Ernest Mueller; Ruel Neeley; Robert Buley; Thomas Giefer; Klemens Thomas; Howard L. Jones; Herbert A. Light; Joseph R. Mackensie; Michael T. McQuillen; John R. Yotz; Harold Bagnall; Richard P. Barthelemy; Clinton Davis; Edison L. Denney; George Gawrilow;

---

John J. Lumley; Albert Newton; Eugene Palsson; Dale B. Petty; Deryl Roark; Donald D. Ecker; Karl A. Jadrnicek; Howard S. Morton; Richard W. Rew; Donovan Wholers; Donald K. Brewster; Peter Hayes; Laurence J. Stuppy, III; Roger Veon, Plaintiffs–Appellants,

v.

AIR LINE PILOTS ASSOCIATION INTERNATIONAL, Defendant–Appellee.

Transportation Communications International Union, Amicus Curiae.

No. 88–2083.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 4, 1992.

Decided April 28, 1993.

 

Robert Fisher Gore, National Right to Work Legal Defense Foundation, Inc., Springfield, VA, argued (Rossie D. Alston, Jr., on brief), for plaintiffs-appellants.

Jerry David Anker, Air Line Pilots Ass'n, Washington, DC, argued (Gary Green, on brief), for defendant-appellee.

Mitchell Kraus, Transportation Communications Intern. Union, Rockville, MD, Marsha S. Berzon, Altshuler & Berzon, San Francisco, CA, for amicus curiae.

Before ERVIN, Chief Judge, RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, WILKINSON, WILKINS, NIEMEYER, HAMILTON, and LUTTIG, Circuit Judges, and BUTZNER, Senior Circuit Judge.

**OPINION**

BUTZNER, Senior Circuit Judge:

Appellants are forty-two nonunion airline pilots employed by one of eight airline companies—Eastern, Braniff, Midway, Northwest, Pan American, United, Western, or USAir—operating under the labor scheme of the federal Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq. See* 45 U.S.C. § 181 (air carriers regulated under the Act). Each of the airlines had an agreement with the Air Line Pilots Association (ALPA) (appellees), designating it as exclusive bargaining representative for the pilots employed by that airline. Under the authority of § 2, Eleventh, of the RLA, the agreement required pilots employed by the airlines either to join ALPA or to remit to ALPA an agency fee in lieu of dues to compensate it for its services in bargaining and representation. 45 U.S.C. § 152, Eleventh (a). The nonunion pilots contend that ALPA's expenditures of exacted funds violated their rights under the RLA and the First and Fifth Amendments. They also charge that ALPA's methods of collecting and accounting for agency fees exacted under these agreements violated the procedural requirements of *Chicago Teachers Union, Local No. 1 v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986).

The district court entered judgment for ALPA. A panel of this court affirmed in *Crawford v. Air Line Pilots Ass'n Int'l,* 870 F.2d 155 (4th Cir.1989). The court subsequently granted rehearing en banc. Thereafter, while the case was pending, the Supreme Court granted certiorari in a public-sector union case involving somewhat similar issues. *Lehnert v. Ferris Faculty Ass'n,* 881 F.2d 1388 (6th Cir.1989), *cert. granted,* 496 U.S. 924, 110 S.Ct. 2616, 110 L.Ed.2d 637 (1990). This court then held its decision in abeyance pending the Supreme Court's decision in *Lehnert.* After that decision, *Lehnert v. Ferris Faculty Ass'n,* —— U.S. ——, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991), we requested supplementary briefs. Following receipt of the briefs, the case was argued before the full court, which now affirms the judgment of the district court.

I

██ The parties entered into a lengthy stipulation of facts before trial, and the district court augmented these with detailed findings of fact in its opinion. We review these findings for clear error. *Lehnert v. Ferris Faculty Ass'n,* —— U.S. at ——, 111 S.Ct. at 1965; *Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

The stipulation discloses that ALPA during the relevant period represented some 37,000 pilots at 43 airline companies, of whom 34,500 were members of ALPA. ALPA charges its members dues of 2.35 percent of their gross pay. The average ALPA member made $80,000 annually and paid $1,880 in

union dues. ALPA is a unitary national labor organization that is not composed of local unions like most other labor organizations. Members' dues go to ALPA directly, and collective bargaining and negotiating policy are directed by the national officers and governing bodies of ALPA, with the assistance of the union's 300–member national staff. The pilots employed at each airline with a union contract elect a Master Executive Council for that airline, and negotiations affecting that airline's collective bargaining agreement are conducted by a committee appointed by the Master Executive Council, assisted by the ALPA staff. Negotiating strategy, and any agreement reached, must be approved by ALPA's national president.

Continental Air Lines in 1983 filed for bankruptcy and sought to abrogate its collective bargaining agreement with ALPA. Continental pilots responded by striking. ALPA members in other airlines by secret ballot repeatedly approved a special assessment to their dues to pay a monthly benefit to the striking Continental pilots, and these benefits were paid until February 1986. In 1985, United Air Lines entered negotiations with its pilots seeking a two-tier wage structure or "B–scale" that would pay newly hired pilots less than those already employed. ALPA resisted this demand, and a strike ensued. Eventually the parties signed a contract granting United a temporary B-scale to end in five years, with binding arbitration to determine its form thereafter. After this agreement, ALPA won similar agreements from other airlines, whose pilots it represented, seeking to impose B-scales.

The disputes with Continental and United weakened ALPA financially. In October 1985, ALPA's membership approved an increase in their dues to create a major contingency fund to be used in important labor disputes or for other expenditures that could not be funded adequately out of the normal budget. Funds were used to support the strikes at Continental and United and were used to prepare for a possible strike at Eastern Air Lines. Some funds were also used for the expense of union organizing drives. These organizing expenses, ALPA agrees, are not chargeable to nonunion agency fee payers.

The district court supplemented the stipulation by findings of fact and inferences that it reasonably drew from the facts, all of which are amply supported by the evidence. We quote the findings at some length, because they are essential to an understanding of why ALPA's expenditures are germane to collective bargaining with all the airlines whose pilots it represents.

> [C]ollective bargaining negotiations at any one airline are directly affected by, and also directly affect, negotiations at all other airlines. Each airline strives to keep its labor costs no higher than those of its competitors. Thus, when one airline obtains some cost-cutting concession from ALPA, other airlines generally seek to obtain the same or an equivalent concession. On the other hand, when ALPA succeeds in negotiating a wage or benefit increase with one airline, that enhances its ability to negotiate a similar increase with other airlines.

Because of this industry pattern, the court found,

> it was important to ALPA, in the interest of all the pilots which it represented, to ensure that what had happened at Continental, namely, a bankruptcy whereby the collective bargaining agreement was abrogated and pilots' salaries were cut in half, not become an industry norm to be sought by other airlines in the bargaining process. For this reason it was in the interest of all pilots, members and non-members alike, that ALPA used its funds to pay the pilots at Continental to make up for their lost wages.

The court further found that

> in 1985, United sought in bargaining to impose a concession which American Airlines had achieved [with another union], namely, a B–Scale two-tier payment arrangement under which airline cockpit personnel hired after a certain date would be paid on a lower pay scale (the B–Scale). ALPA supported financially the pilots who struck United, and ultimately, after a twenty-nine day strike, secured from United a six-year parity requirement under the B–Scale arrangement. This accomplish-

ment has been used to benefit all members (and non-members) in all the airlines, not just those employed by United.

In its discussion of the major contingency fund, the court found that

[t]he United and Continental strikes considerably weakened ALPA's financial stability. Since a financially weak ALPA was vulnerable to a prolonged strike, ALPA lost its credibility with management because the other airlines knew it could not financially sustain a long strike. For this reason, the Major Contingency Fund was created.... It was from this fund that some expenditures, beginning in 1985, were made to support the striking pilots at Continental and United. Plaintiffs attack the fund as an improper expenditure of the dues of the objecting plaintiffs. Again the court finds the creation of the fund to be a device reasonably employed to implement the duties of the union as exclusive representative of the employees in the bargaining unit.

## II

■ The principal complaint of the objecting nonunion pilots concerns ALPA's use of their agency fees to support strikes and other activities of bargaining units at airlines where they are not employed. Closely related is their complaint that ALPA used their agency fees to support the major contingency fund. The nonunion pilots assert that use of agency fees for expenses related to bargaining outside the unit at the airline where a pilot works violates both the Railway Labor Act and their constitutionally protected rights of free association.

Section 2, Eleventh of the Railway Labor Act provides that regulated carriers and unions may agree that "as a condition of continued employment, ... all employees shall become members of the labor organization representing their craft and class." 45 U.S.C. § 152, Eleventh (a). This provision was added to the RLA in 1951. Five years later, the Supreme Court sustained the agency-fee provisions of the RLA against attack on their facial constitutionality under the First and Fifth Amendments. *Railway Employees Dep't v. Hanson,* 351 U.S. 225, 238, 76 S.Ct.

714, 721, 100 L.Ed. 1112 (1956). At the same time, it found that the requirement that unwilling workers pay agency fees to the union might under other circumstances pose a constitutional problem, since the enactment of § 2, Eleventh is "the governmental action on which the Constitution operates, though it takes a private agreement to invoke the federal sanction." *Hanson,* 351 U.S. at 232, 76 S.Ct. at 718.

The intrusion into individual freedom of choice is justified by Congress' desire to ensure "[i]ndustrial peace along the arteries of commerce," *Hanson,* 351 U.S. at 233, 76 S.Ct. at 719, and by the need to reduce labor friction through "the elimination of the 'free riders'—those employees who obtained the benefits of the unions' participation in the machinery of the Act without financially supporting the unions." *International Ass'n of Machinists v. Street,* 367 U.S. 740, 761–62, 81 S.Ct. 1784, 1796, 6 L.Ed.2d 1141 (1961). However, the RLA does not give "unions, over an employee's objection, the power to use his exacted funds to support political causes which he opposes." *Street,* 367 U.S. at 768–69, 81 S.Ct. at 1800 (footnote omitted).

*Lehnert v. Ferris Faculty Ass'n,* —— U.S. ——, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991), concerned not a carrier regulated by the RLA but a public-employee union exacting agency fees pursuant to a state statute. However, "[b]ecause the Court expressly has interpreted the RLA 'to avoid serious doubt of [the statute's] constitutionality,' the RLA cases necessarily provide some guidance regarding what the First Amendment will countenance in the realm of union support of political activities through mandatory assessments." *Lehnert,* —— U.S. at ——, 111 S.Ct. at 1957 (citations omitted). Examining the prior cases, the Court deduced that the constitutionality of challenged agency-fee expenditures must be measured against a three-part test. Chargeable activities must

(1) be "germane" to collective-bargaining activity; (2) be justified by the government's vital policy interest in labor peace and avoiding "free riders"; and (3) not significantly add to the burdening of free

speech that is inherent in the allowance of an agency or union shop.

— U.S. at ——, 111 S.Ct. at 1959.

Applying these principles, the Court specifically rejected the agency-fee objectors' contention that the "local union may not utilize dissenters' fees for activities that, though closely related to collective bargaining generally, are not undertaken directly on behalf of the bargaining unit to which the objecting employees belong." The Court found this contention "to be foreclosed by our prior decisions." — U.S. at ——, 111 S.Ct. at 1959. To require that expenses concern the specific bargaining unit "would be to ignore the unified-membership structure under which many unions, including those here, operate." — U.S. at ——, 111 S.Ct. at 1961. Under this structure, "[t]he essence of the affiliation relationship is the notion that the parent will bring to bear its often considerable economic, political, and informational resources when the local is in need of them. Consequently, that part of a local's affiliation fee which contributes to the pool of resources potentially available to the local is assessed for the bargaining unit's protection, even if it is not actually expended on that unit in any particular membership year." — U.S. at ——, 111 S.Ct. at 1961.

The Court recognized limitations on the union's power to spend exacted fees for bargaining activities unrelated to the bargaining unit: the Constitution bars "a direct donation or interest-free loan to an unrelated bargaining unit for the purpose of promoting employee rights or unionism generally," as well as a "contribution by a local union to its parent" that is "in the nature of a charitable donation." — U.S. at ——, 111 S.Ct. at 1961. Nevertheless, extra-unit bargaining expenditures are legitimate if there is "some indication that the payment is for services that may ultimately enure to the benefit of the members of the local union by virtue of their membership in the parent organization." — U.S. at ——–——, 111 S.Ct. at 1961–62. Among the expenditures approved by the *Lehnert* Court in this context were funds used to prepare for a potential strike. The Court upheld the district court's findings that such preparations are "reasonable bar-

gaining tools." — U.S. at ——, 111 S.Ct. at 1965.

The holding in *Lehnert*, read in conjunction with the district court's extensive findings of fact, makes the union's case for the challenged expenditures, if anything, stronger than it had been under previous precedent. ALPA's "unified-membership structure," — U.S. at ——, 111 S.Ct. at 1961, is even tighter than that of the union in *Lehnert*. As the district court found, negotiations at other airlines were not only germane to the bargaining process at each airline bargaining unit, but in essence determined the result of the bargaining process. Expenditures to prevent the extraction of concessions from ALPA by individual airlines handily meet the *Lehnert* test. Because support for the striking pilots was of crucial importance in establishing the union's bargaining position in each airline unit, the requirement that agency-fee objectors provide funds for the strike benefits was clearly justified by the bargaining pattern and practice in the airline industry.

### III

■ Appellants attempt to challenge the use of their fees for the major contingency fund as an "involuntary loan." While the *Lehnert* Court cautioned in dictum that exacted funds could not be used for an "interest-free loan to an unrelated bargaining unit for the purpose of promoting employee rights or unionism generally," — U.S. at ——, 111 S.Ct. at 1961, the ALPA fund does not match that description. The fund is, in the findings of the district court, "a device reasonably employed to implement the duties of the union as exclusive representative of the employees in the bargaining unit." Like the payments to the national union approved in *Lehnert*, the fund "contributes to the pool of resources potentially available to the local" and thus "is assessed for the bargaining unit's protection, even if it is not actually expended on that unit in any particular membership year." — U.S. at ——, 111 S.Ct. at 1961. Here, the purposes for which the fund was created were, by finding of the district court, germane to collective bargaining. As they were designed to further the union's

duty of representation, they were by definition justified by the policies underlying the RLA. Finally, we do not believe that the burden to constitutional rights imposed by permissible exaction of fees is heightened simply because the funds are assessed in advance of labor actions rather than contemporaneously or afterwards.

Accordingly, applying the test enunciated by the Court in *Lehnert*, we hold that a pro rata share of strike support benefits for pilots in other bargaining units and of the pro rata cost of the major contingency fund may be charged to objecting agency-fee payers. *Accord Pilots Against Illegal Dues v. Airline Pilots Ass'n.*, 938 F.2d 1123, 1131 (10th Cir. 1991).

In their supplemental briefs, both parties debate the implications of *Lehnert* for litigation expenses. However, nowhere in appellants' complaint, the stipulations of fact, or the district court's findings is there any mention of extra-unit litigation expenses in this case. The issue simply has not been properly presented and preserved below, and therefore we express no view about it. *See United States v. One 1971 Mercedes Benz*, 542 F.2d 912, 915 (4th Cir.1976).

## IV

█ The appellants also complain that 1985 and 1986 rebate system for agency fees did not comply with the requirements imposed by *Chicago Teachers v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986). They do not complain about the current rebate system. *Hudson* holds that union procedures for accounting and rebate or advance reduction of agency fees must "include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending." *Hudson*, 475 U.S. at 310, 106 S.Ct. at 1078.

Pointing out that *Hudson* dealt with a public employer and public employees, ALPA contends that state action and consequent applicability of the First Amendment are not involved in this case, because airline transportation is a private industry. Supporting this thesis with recent Supreme Court decisions that deny the applicability of the state action doctrine to private transactions, ALPA asserts that the procedures required by *Hudson* do not apply to private collective bargaining agreements.

We cannot accept ALPA's position. It is squarely rebutted by *Hanson*, 351 U.S. at 232, 76 S.Ct. at 718, and we do not agree that the Supreme Court has implicitly overruled *Hanson*. ALPA must, and now does, provide nonunion pilots the same procedural protection required by *Hudson*.

█ From 1978 until 1983, ALPA rebated to each nonunion agency fee payer who objected to use of agency fees for political purposes a percentage of the fee paid, plus interest, based on ALPA's computation of the percentage of its total expenditures that were used for political purposes. ALPA revised its rebate procedures after the Supreme Court decided *Ellis v. Brotherhood of Ry. Clerks*, 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984). The new procedures, designed to conform to *Ellis*, established an interest-bearing escrow account into which ALPA deposited 150 percent of the amount it estimated would be rebatable at the end of the relevant year. In 1986, after the Supreme Court's decision in *Hudson*, ALPA set up a procedure by which dissenting agency fee payers could seek arbitration of disputes about the proper amount of rebates. ALPA pays the expense of arbitration. By mutual agreement, arbitration for years since 1985 has been stayed pending this litigation.

In November 1987, ALPA granted agency fee payers an option to receive either an advance reduction of their dues or a rebate with interest from the escrow account. In December 1987, a summary and explanation of the 1986 rebate system was sent to all agency fee payers. Previously, such information had been sent only to agency fee payers who had objected to use of their fees for noncharsgeable expenses.

The district court held that appellants' claims were barred by the statute of limitations; however, the court also found that

the procedures for the year 1987 are well within the requirements of *Hudson*, and

the procedures for the year 1986 substantially within them. For the years prior to 1985 there may have been deficiencies; however, no specific damage to any plaintiff as a result of any deficiency in the rebate program itself has been shown, and the court is unwilling to require an audit, notice, or an opportunity to object on the possibility that there may be revealed some inappropriate expenditures warranting additional rebates.

A panel of this court held that the appellants' claims were not time-barred. For reasons stated in its opinion, we affirm that ruling. *Crawford v. Air Line Pilots Ass'n Int'l,* 870 F.2d 155, 159 (4th Cir.1989). The panel affirmed the alternative holding of the district court that the challenged plans substantially complied with *Hudson* and that appellants had proved no damages arising out of delay or minor procedural deficiencies. With respect to the procedural aspect of the rebate system, we affirm the district court for reasons stated in the panel opinion. *See Crawford,* 870 F.2d at 159–61.

*AFFIRMED.*

WILKINSON, Circuit Judge, concurring:

I vote to affirm the district court's judgment because I believe that we are required by *Lehnert v. Ferris Faculty Association,* —— U.S. ——, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991), to do so. Judges are in the business of taking language seriously, and the language in *Lehnert* nails the result here to the mast.

In *Lehnert,* a majority of the Supreme Court held that non-ideological expenses may be chargeable to union dissenters even in the absence of "a direct relationship between the expense at issue and some tangible benefit to the dissenters' bargaining unit." *Id.* at ——, 111 S.Ct. at 1961. Although *Lehnert* does not "grant a local union carte blanche to expend dissenters' dollars for bargaining activities wholly unrelated to the employees in their unit," *id.,* all that is required is "some indication that the payment is for services that may ultimately enure to the benefit of the members of the local union by virtue of their membership in the parent organization," *id.* at —— – ——, 111 S.Ct. at 1961–62;

*see also id.* at ——, 111 S.Ct. at 1981 (Scalia, J., concurring in the judgment in part and dissenting in part) (approving a pooling arrangement because "[i]t is a tangible benefit" to a bargaining unit to have "services on call, even in the years when they are not used" by that unit).

Because ALPA's strike reserve fund was potentially available for the benefit of pilots at every bargaining unit, payments for creation and maintenance of the fund "may ultimately enure to the benefit" of pilots at each bargaining unit and therefore the fund passes muster under *Lehnert.* The strike reserve fund is a pooling arrangement into which pilots, both union and non-union, at the various airlines with which ALPA has agency shop agreements pay a certain percentage of their airline salaries. The fund is intended to be used for major labor disputes and for other expenditures that cannot be funded through ALPA's normal budgeting practices and policies. It is potentially available for the benefit of pilots, including non-members, at all airlines. *Lehnert* approved such pooling arrangements and made clear that pooled funds need not directly benefit any particular bargaining unit in any given year. Moreover, in *Lehnert* the Court held that strike-preparation activities—such as ALPA's strike reserve fund—are adjuncts to the bargaining process and are therefore chargeable to union dissenters. *See* —— U.S. at —— – ——, 111 S.Ct. at 1965–66; *id.* at ——, 111 S.Ct. at 1981 (Kennedy, J., concurring in the judgment in part and dissenting in part).

Likewise, I must conclude that the expenditures in support of the United and Continental strikes, and in preparation for a possible Eastern strike, are chargeable under *Lehnert.* In this case, as Judge Butzner notes, the district court made detailed and exhaustive factual findings. Based on these findings, it concluded that "collective bargaining negotiations at any one airline are directly affected by, and also directly affect, negotiations at all other airlines." These factual findings—which are not clearly erroneous and which are similar to the conclusions of other courts, *see Pilots Against Illegal Dues v. Air Line Pilots Ass'n,* 938 F.2d 1123, 1128 (10th Cir.1991)—compel me to

conclude that there is "some indication" that these expenditures "may ultimately enure to the benefit" of pilots at airlines other than Continental, United, and Eastern.[1]

Plaintiffs have been candid before this court. They recognize that *Lehnert* is anything but a favorable case for their position. Included in their supplemental brief is a chart of the Justices' various positions on the different issues presented in that case. Plaintiffs note "the deeply divided court" that decided *Lehnert* and "the retirement of Justice Marshall," and invite us to adopt the position of the *Lehnert* dissent. That is not an invitation, however, that a court of appeals judge can accept. *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 1921, 104 L.Ed.2d 526 (1989) (noting that lower courts should follow a precedent with "direct application in a case" and "leav[e] to [the Supreme] Court the prerogative of overruling its own decisions"); *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 535, 103 S.Ct. 1343, 1344, 75 L.Ed.2d 260 (1983) (*per curiam* ) ("Needless to say, only this Court may overrule one of its precedents.").[2]

The charged expenses here were not ideological, and the agency fees were not assessed to promote either the cause of unionism in general or political positions that a union leadership might support but to which individual members might take vigorous exception. *See Lehnert,* —— U.S. at —— ——, 111 S.Ct. at 1957–58. Apart from such constitutional concerns, the judgment of whether arrangements such as ALPA's will promote industrial peace or lead to disrup-

tions in transportation and commerce must be left to Congress. Because *Lehnert* makes clear that no constitutional barriers exist to the chargeability of the expenses in this case, I share the court's conclusion that the judgment of the district court must be affirmed.

I am authorized to say that Judge WILKINS joins in this opinion.

RUSSELL, Circuit Judge, dissenting:

I feel impelled to dissent from the majority and concurring opinions. My reasons, stated in largely summary form, are as follows:

(1) In addressing, or failing to address, the charges assessed by the union against plaintiffs for litigation connected with the strikes at United Airlines and Continental Airlines, both the majority and the concurring opinions disregard the rules of pleading and of burden of proof enunciated by the Supreme Court in *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), and *Brotherhood of Ry. & S.S. Clerks, Freight Handlers, Express & Station Employees v. Allen,* 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963). These litigation expenses were a substantial portion of the charges against plaintiffs; in fact, the union justified its need for additional assessments for the Major Contingency Fund on the ground that these expenses had been very large. The majority, however, completely avoids addressing these litigation charges by holding that plaintiffs failed to put in issue their validity because "nowhere in appellants' complaint, the stipulations of fact, or the district court's findings is there any mention of litigation expenses;" it even goes so far as

---

1. The direct impact of bargaining at one airline on bargaining at other airlines may be the result both of the somewhat unique organizational structure of ALPA and of the national nature of the industry. In cases involving other industries and other unions, therefore, such a factual finding may not be present. In such circumstances, of course, application of *Lehnert* may very well result in a different outcome.

2. Plaintiffs also suggest that, while *Lehnert* may govern constitutional challenges to agency fees, we should adopt the *Lehnert* dissent as the proper interpretation of Railway Labor Act (RLA) § 2, Eleventh, 45 U.S.C. § 152, Eleventh. I find this argument unconvincing. Plaintiffs have cited no authority to support their argument that the stan-

dard governing under the RLA is different from that governing under the First Amendment, and both the *Lehnert* majority and dissent relied on statutory cases and recognized that there is no bright line separating the constitutional and statutory analyses. *See Lehnert,* —— U.S. at ——, 111 S.Ct. at 1957 ("Although they are cases of statutory construction, *Street* and *Allen* are instructive in delineating the bounds of the First Amendment in this area as well."); *id.* at ——, 111 S.Ct. at 1978 (Scalia, J., concurring in the judgment in part and dissenting in part) (*"Street, Ellis,* and *Beck* were statutory cases, but there is good reason to treat them as merely reflecting the constitutional rule....").

to chide the parties for addressing the validity of these charges in their briefs. The concurrence fails entirely even to acknowledge that litigation expenses are part of this case.

*Allen* and *Abood* establish that to put in issue the validity of charges by the union against dissenting employees under an agency bargaining contract, dissenters are not required to identify the specific expenditures to which they object; it is only necessary that they allege generally that they oppose being charged for "expenditures of *any* sort" that are impermissible. *Abood*, 431 U.S. at 241, 97 S.Ct. at 1802; *Allen*, 373 U.S. at 118, 83 S.Ct. at 1161. Such an allegation puts in issue all the charges made by the union in the case and places on the union the burden of showing that such charges were proper. *Abood*, 431 U.S. at 239 n. 40, 97 S.Ct. at 1802 n. 40; *Allen*, 373 U.S. at 122, 83 S.Ct. at 1163; *see also Chicago Teachers Union v. Hudson*, 475 U.S. 292, 306 & n. 16, 106 S.Ct. 1066, 1076 & n. 16, 89 L.Ed.2d 232 (1986); *Beck v. Communications Workers*, 776 F.2d 1187, 1209 (4th Cir.1985), *aff'd*, 487 U.S. 735, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988).

Plaintiffs here stated in their complaint that they objected to any charges by the union that were impermissible under Section 2, Eleventh of the Railway Labor Act ("RLA"), § 2 (Eleventh), 45 U.S.C. § 152 (Eleventh). In addition, with regard to the charges for litigation in connection with the United and Continental strikes, they made more than a general objection because they expressly opposed in their complaint the union's charges for the expenses for United and Continental strikes, and the litigation expenses were part of expenses charged for the strikes. Plaintiffs, therefore, clearly exceeded the requirements set forth in *Abood* and *Allen* to put in issue the validity of the union's charges for these litigation expenses.

It should be noted that counsel for the union and counsel for *amicus*, both of whom devoted substantial portions of their briefs to addressing the validity of these litigation charges, did not even attempt to argue that these charges were not at issue. That these two counsel, who are both experienced in labor litigation and have been involved with several of the Supreme Court decisions in this area of labor law, took this position illustrates well how far-fetched the majority's and concurrence's conclusion is that the litigation charges are not at issue here.

The majority's and concurrence's error in this respect is particularly critical. In *Ellis v. Brotherhood of Ry., Airline & S.S. Clerks, Freight Handlers, Express & Station Employees*, 466 U.S. 435, 453, 104 S.Ct. 1883, 1894, 80 L.Ed.2d 428 (1984), and *Lehnert v. Ferris Faculty Ass'n.*, — U.S. —, —, 111 S.Ct. 1950, 1964, 114 L.Ed.2d 572 (1991), the Supreme Court, in positive, clear-cut terms, declared as bluntly as it could that expenses for litigation outside of a dissenter's unit ("extra-unit litigation"), were not chargeable against the dissenter. For the great majority of plaintiffs here,[1] the litigation in connection with the United and Continental strikes was extra-unit litigation.[2] Thus, under *Ellis* and *Lehnert*, the expenses for this litigation were not chargeable against the great majority of plaintiffs. As a result, this issue alone is sufficient to require reversal of the decision of the district court herein.

(2) In their treatment, or lack of treatment, of the charges assessed by the union against non-union members for the threatened strike and strike at Eastern Airlines, the majority and the concurring opinions ignore the Supreme Court's directive in *Lehnert* that in determining whether a union's charges are proper, each expenditure must be analyzed individually. At issue in this case are the union's expenditures for strikes at United and Continental and for a threatened strike and strike at Eastern. Both the majority and the concurrence analyze the chargeability of all of these expenditures together. The majority reiterates the district court's findings and interprets them to establish that "support for the striking pilots [in the industry] was of crucial importance in establishing the union's bargaining position in each airline unit." As a result, it holds

---

1. The exceptions are plaintiffs who are United pilots. No Continental pilots are plaintiffs.

2. For an explanation of why the Air Line Pilots Association ("ALPA") is divided into separate units, *see* pages 1307–08 *infra*.

that the expenditures for the United, Continental and Eastern controversies were "clearly justified." The concurrence similarly is "compel[led] ... to conclude" that "the expenditures in support of the United and Continental strikes, and in preparation for a possible Eastern strike, are chargeable" based on the district court's findings that "collective negotiations at any one airline are directly affected by, and also directly affect, negotiations at all other airlines."

*Lehnert,* however, requires "a *case-by-case analysis* in determining which activities a union ... may charge to dissenting employees." *Id.* at ——, 111 S.Ct. at 1959 (emphasis added). This required "case-by-case analysis" compels us to examine individually the chargeability of the union's expenditures for the threatened strike and strike at Eastern.

When the chargeability of the expenditures on the controversy at Eastern is examined individually, the majority's and concurrence's summary conclusions that these expenditures are chargeable cannot stand. The union had the burden of showing that charging plaintiffs for the expenditures was proper. *Abood,* 431 U.S. at 239 n. 40, 97 S.Ct. at 1802 n. 40; *Allen,* 373 U.S. at 122, 83 S.Ct. at 1163. The record, however, is completely barren of any explanation of the Eastern controversy or any reason why the controversy affected plaintiffs' collective bargaining. Indeed, while the circumstances of the Continental and United strikes were set forth by the union in the testimony of ALPA's president, the union failed to offer any evidence whatsoever about the Eastern controversy. No court could possibly find on this record that the union met its burden of showing that the expenditures on the Eastern strike were proper.

In addition, the district court, on whose findings the majority and concurrence base their summary conclusions that the union's expenditures on the United, Continental, and Eastern controversies are chargeable, made no finding that the Eastern controversy affected bargaining in the plaintiffs' units. In fact, it made clear that it was not even aware that charges for the Eastern controversy were at issue in the case: "Plaintiffs' ...

claim is that ... expenses for certain union activities, namely, the support of the pilots' strikes *at United Airlines and Continental Airlines,* ... were improper." (emphasis added).

Moreover, it is highly probable that, as a matter of constitutional and statutory law, charges for the expenditures on the Eastern controversy were impermissible. Plaintiffs stated at oral argument that the strike at Eastern was a sympathy strike in support of a strike by a Machinists' Union unit. If plaintiffs' statement is true, the expenditures on the Eastern controversy would have had no effect on the plaintiffs' collective bargaining and clearly could not have been charged. *See Beck,* 776 F.2d at 1212 (holding that charging non-union employees in a unit of a communications union for expenditures in support of a strike by the United Mine Workers was improper). Needless to say, I believe that this issue alone is also sufficient to require reversal of the district court's holding that all the union's charges against plaintiffs were proper.

(3) In setting forth their standard for determining the expenses unions are permitted to charge against dissenting employees, the majority and the concurring opinions grievously misconstrue the Supreme Court's opinion in *Lehnert* and give to it a meaning that its author, Justice Blackmun, never contemplated or intended. The majority and the concurring opinions latch onto a single, isolated sentence in *Lehnert:* "There must be some indication that the payment is for services that may ultimately enure to the benefit of the members of the local union by virtue of their membership in the parent organization." *Lehnert,* —— U.S. at —— – ——, 111 S.Ct. at 1961–62. They read this sentence as establishing a standard that any expenditures by the union for activities outside a dissenting employee's unit may be charged against the dissenting employee if the union shows that the activities "may ultimately enure" in this way.

As I will explain more fully below, this sentence in *Lehnert* was intended to set a chargeability standard only for a limited class of extra-unit expenses, not for all extra-unit expenses. *See* pages 1314–15 *infra.*

That it was not intended to be applied to all extra-unit expenses is clear for at least two reasons. First, the Court in *Lehnert* itself expressly declined to apply it as the chargeability standard for several of the extra-unit expenditures at issue before it. In addressing the chargeability of extra-unit litigation expenses, for example, the Court stated that "[w]hile respondents are clearly correct that precedent established through litigation on behalf of one unit may ultimately be of some use to another unit, ... such activities are not germane to the union's duties as exclusive bargaining representative" and may not be charged against dissenting employees. *Id.* at ——, 111 S.Ct. at 1963–64. In other words, even though expenses "may ultimately enure to the benefit of the members of the local union," they are not chargeable because they are not germane.

Second, the sentence latched onto by the majority and concurrence as the chargeability standard for all extra-unit expenses is fundamentally different from the standard for chargeability that the Court has employed in every opinion it has rendered relating to the issue before us and that *Lehnert* itself reaffirmed and adopted. The Court has held in every opinion relating to this issue that the standard for determining the validity of charges assessed against dissenters was that charges be "germane" to the collective bargaining of the dissenter's unit. *See, e.g., Communications Workers v. Beck,* 487 U.S. 735, 745, 108 S.Ct. 2641, 2648, 101 L.Ed.2d 634 (1988) ("The statutory question presented in this case, then, is whether [a dissenter's obligation to support the union] includes the obligation to support union activities beyond those *germane* to collective bargaining, contract administration, and grievance adjustment. We think *it does not.*") (emphasis added); *Ellis,* 466 U.S. at 448, 104 S.Ct. at 1892; *Abood,* 431 U.S. at 236, 97 S.Ct. at 1800; *Allen,* 373 U.S. at 121, 83 S.Ct. at 1163. Under the "germaneness" standard, expenses for litigation "incident to negotiating and administering the contract or to settling grievances and disputes arising in the bargaining unit" were found chargeable, *Ellis,* 466 U.S. at 453, 104 S.Ct. at 1895; expenses for extra-unit litigation, *id.,* and

extra-unit organizing, *id.* at 451–53, 104 S.Ct. at 1893–95, were held not chargeable.

*Lehnert* specifically adopted this same germaneness standard and, in doing so, expressly reaffirmed the holdings in all of these prior cases. *Lehnert,* —— U.S. at ——, 111 S.Ct. at 1959. Applying this standard, it determined that extra-unit litigation expenses, *id.* at —— – ——, 111 S.Ct. at 1963–64, and public-relations expenses "which covered informational picketing, media exposure, signs, posters and buttons," *id.* at ——, 111 S.Ct. at 1964 (quotation omitted), were not chargeable, while expenses for a threatened strike in the dissenting employee's unit were chargeable, *id.* at —— – ——, 111 S.Ct. at 1965–66.

The great difference between the standard that the majority and the concurrence read *Lehnert* to establish and the germaneness standard is readily apparent when the former is applied to any of the expenditures the Court has analyzed under the germaneness standard. Extra-unit organization and extra-unit litigation, for example, would be chargeable under the majority's and concurrence's standard because there is "some indication that the payment [for them] is for services that may ultimately enure to the benefit of the members of the local union by virtue of their membership in the parent organization." *Id.* at —— – ——, 111 S.Ct. at 1961–62. The Supreme Court has settled beyond doubt, however, that these expenditures fail to meet the germaneness test and may not be charged against dissenting employees.

In sum, *Lehnert* did not adopt a standard that extra-unit expenses are chargeable whenever there is "some indication that the payment is for services that may ultimately enure to the benefit of the members of the local union by virtue of their membership in the parent organization." *Id.* at —— – ——, 111 S.Ct. at 1961–62. The majority and the concurrence err in adopting this language as a general standard for the chargeability of extra-unit expenses and in holding that the expenditures for the strikes at United and Continental are chargeable on the ground they satisfy this mistaken standard.

(4) In indicating that *Lehnert*'s treatment of the chargeability of expenses used to prepare for a strike supports its own holding that the expenditures here for the controversies at Continental, United and Eastern were chargeable, the majority opinion misinterprets *Lehnert* again. *Lehnert* addressed the chargeability of certain "expenses incident to preparation for a strike" within the dissenters' bargaining unit. *Id.* at ——, 111 S.Ct. at 1965. It explained that these expenses were chargeable because they "f[e]ll within the range of reasonable bargaining tools available to a public sector union during contract negotiations." *Id.* (quotation omitted). The majority cites this holding as supporting its holding that the expenditures for the strikes at United and Continental and the threatened strike and strike Eastern were chargeable.

It is clear from the *Lehnert* Court's analysis that its holding that these expenditures are chargeable rests upon the facts that (1) the threat of strike was in the unit of which the dissenters were members, and (2) the expenditures were made "during contract negotiations." So circumscribed, *Lehnert*'s holding does not apply to the expenditures here for the threatened strike at Eastern because, for the great majority of plaintiffs,[3] these were for a threatened strike *in another unit.* It also does not apply to the strikes expenditures at United, Continental and Eastern because these expenditures were also "extra-unit" expenditures for the great majority of plaintiffs [4] and, as they were used for strikes and not threatened strikes, they were unrelated to "contract negotiations." The majority, thus, errs in relying on *Lehnert*'s holding regarding preparation for a strike to support its holding that the expenditures on the United, Continental and Eastern controversies are chargeable.

We now state in greater detail our reasons for disagreement with the majority and the concurring opinions, beginning with a statement of some of the facts that were not fully set forth in these opinions.

---

[3]. The exceptions are, obviously, plaintiffs who are Eastern pilots.

[4]. Obviously, with regard to the expenditures on the Eastern strike, the exceptions are the plain-

## I.

The Air Line Pilots Association (ALPA), which is the defendant in this action, is a national labor organization engaged in representing the pilots employed by twenty-two domestic airlines. The "governance structure" of ALPA, as described in the statement of Stipulated Facts, is that of "a unitary national labor organization not composed of local unions like other labor organizations; all ALPA members belong only to one organization and paying their dues only to ALPA." Appendix ("App.") at 43. It operates as follows:

> Airlines station their pilots at domiciles (bases) and ALPA establishes a Local Council for each domicile of an airline. The pilots assigned to that domicile elect Local Council representatives for each pilot position—i.e., captain, first officer, second officer—stationed at that domicile. All of the local council representatives at each airline constitute the "Master Executive Council" (MEC) for that airline. Each MEC elects a Chairman, Vice–Chairman, and Secretary–Treasurer....
>
> All of the MEC's at all of the airlines constitute ALPA's Board of Directors, which is its highest governing body. The Board of Directors elects four national officers—President, First Vice President, Secretary, and Treasurer—and five Executive Vice Presidents. These officers are also *ex officio* members of the Board of Directors....

App. at 44.

The master executive council of each airline selects its own "negotiating committee" to conduct contract negotiations. App. at 45–46. It is true that these negotiating committees "report[ ] regularly to the President on the progress of such negotiations," "exchange information on what is happening at their respective airlines," and share "a staff of economic and financial analysts who collect data and perform studies relevant to collec-

---

tiffs who are Eastern pilots; with regard to the expenditures on the United strike, the exceptions are plaintiffs who are United pilots.

tive bargaining." App. at 46. At bottom, however, each negotiating committee negotiates separately from the negotiating committees at other airlines and signs a separate collective bargaining agreement with each airline. App. at 45–46 ("The actual negotiations at each airline are conducted by a Negotiating Committee selected by the MEC at that airline . . . ."). In many instances, these agreements contain different provisions. App. at 47–48.

The plaintiffs in the action are forty-two pilots employed by Braniff, Eastern, Midway, Northwest, Pan American, United, USAir, or Western. They do not belong to the union, and object to any charges against them by the union, under the heading "Dues," that went beyond expenses germane to the negotiation and administration of the collective bargaining agreement executed by their own employer.

The plaintiffs' objections focus on charges made against them by the union to support strikes at Continental, United, and a threatened strike and strike at Eastern in 1983–1987.[5] The record is not entirely clear as to exactly how these charges were used to support these strikes and this threatened strike throughout this period. It is clear, however, that a portion of the charges assessed against the plaintiffs in 1985, 1986, and 1987 to support the Continental strike was used to fund litigation related to that strike. App. at 86, 99, 110A, 121, 126, 128. In addition, at least in 1986, some of the charges assessed against the plaintiffs to support the United strike were used to finance litigation related to that strike. App. at 98. The proportion of strike expenditures used to fund litigation was apparently substantial because the union justified its additional assessments for the Major Contingency Fund on the ground that it had incurred heavy litigation expenses in connection with the Continental and United strikes.

The record is also hopelessly unclear on the cause of the threatened strike and strike

at Eastern. The only witness to testify about the causes of the several strikes the plaintiffs were charged to support was ALPA's president, Captain Henry Duffy. Counsel for the union examined Captain Duffy in detail about the cause of the Continental strike, Trial Transcript ("Tr.") at 68–70, and the cause of the United strike, Tr. at 70–72; he did not ask him a single question about the threatened strike at Eastern. At argument, plaintiffs' counsel stated that the threatened strike was in sympathy with a strike by the members of a local union of the Machinists' Union at Eastern.

The district court found all of the union's charges lawful and dismissed plaintiffs' claims. Quoting *Ellis,* 466 U.S. at 448, 104 S.Ct. at 1893, it stated that the union could properly charge plaintiffs for expenses incurred for "activities or undertakings *normally or reasonably employed to implement or execute the duties of the union as exclusive bargaining representative.*" (emphasis added). The expenditures on strikes at United and Continental, it determined, "were reasonably employed to implement the duties of the union as exclusive representative of the employees in [other] bargaining unit[s]" because, since "collective bargaining negotiations at any one airline are directly affected by, and directly affect, negotiations at all other airlines," expenses to support strikes at United and Continental were "directly beneficial to the bargaining unit of each plaintiff." It did not acknowledge that a significant portion of these expenditures were incurred for litigation in connection with the strikes.

The district court did not address whether the expenditures on the threatened strike at Eastern were reasonably employed to implement the union's duties as bargaining agent. In fact, while the record clearly shows that plaintiffs were charged for these expenses and that plaintiffs specifically objected to them in their complaint, the district court never recognized that such expenses were at issue in the case. As it understood the case,

---

**5.** These charges were assessed against the plaintiffs in two ways. First, the union used part of the normal union dues, which the plaintiffs were required to pay, to support these strikes. App. at 86. Second, in June, 1985, to better its ability to support strikes, the union increased its dues in

order to create a "Major Contingency Fund." App. at 48. Plaintiffs were required to pay these increased dues to create and develop this fund, which was used from 1985–1987 almost exclusively to support the United, Continental, and Eastern strikes. App. at 128.

"[p]laintiffs' ... claim [was] that ... expenses for certain union activities, namely, the support of the pilots' strikes *at United Airlines and Continental Airlines,* ... were improper." (emphasis added); in fact, nowhere in its opinion is there a single reference to the Eastern controversy. However, by sustaining all of the union's charges against plaintiffs, the district court held, unknowingly, that expenses incurred for the threatened strike and strike at Eastern were chargeable against plaintiffs.

The majority affirms the district court's holding that all of the union's charges were proper. It states that under *Lehnert,* which was decided after the district court issued its opinion, the union may charge dissenters for the expenditures on the controversies at United, Continental, and Eastern if there is "some indication that the payment [for them] [was] for services that may ultimately enure to the benefit of the members of the local union by virtue of their membership in the parent organization." *Lehnert,* —— U.S. at ——–——, 111 S.Ct. at 1961–62. It holds that these charges "handily meet the *Lehnert* test" because "negotiations at other airlines ... determined the result of the bargaining process [at each airline bargaining unit]." The majority declines to address the charges for litigation expenses incurred in connection with the United and Continental strikes on the ground that the issue of their validity "was not properly presented or preserved below."

The concurrence, too, would affirm the district court's holding that all the union's expenses here are chargeable. It finds *Lehnert* to establish as the chargeability standard here the same standard used by the majority, and concludes that the expenses on the United, Continental, and Eastern controversies satisfy this standard because "collective bargaining negotiations at any one airline are directly affected by, and also directly affect, negotiations at all other airlines." It fails even to mention that a substantial portion of the strike expenses at United and Continental were incurred for litigation.

## II.

The issue in this appeal is a recurring one which involves the construction of important provisions of both the RLA and the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.,* and which has unquestionable constitutional implications. It is whether a union, designated as exclusive bargaining agent for an employer's employees under an agency contract,[6] may impose on non-union employees in the bargaining unit "dues" to be used in whole or in part for activities objected to by the non-union employees in the bargaining unit. The problem emerged in the enactment of Section 2, Eleventh, in the 1951 revision of the RLA, which authorized the execution of agency contracts. Under the agency contract concept, the union, when selected as bargaining agent, functions as the exclusive bargaining agent for all employees, union or non-union, with the power to exact from all of them "dues."

In *Railway Employees Dept. v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956), the Supreme Court addressed the constitutionality of these agency contract arrangements. The Court recognized that exacting dues from non-union employees implicated their constitutional rights. *Id.* at 235, 76 S.Ct. at 719. The Court held, however, that, since the union as bargaining agent was obligated to represent the non-union employee along with the union employee, the union was entitled to charge the non-union employee for the costs of the "work of the union in the realm of collective bargaining" which it was statutorily required to conduct. *Id.*

Five years later, in *International Ass'n of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), the Court made clear that unions' power to charge dissenting employees was limited. In *Street,* the plaintiffs, non-union employees, challenged as impermissible certain charges made by the union to further its political purposes. The Court found that such expenditures, which were incurred for the purpose of "support[ing] candidates for public office, and

---

**6.** For an explanation of the difference between a strict union-shop agreement and an agency shop,

*see Abood,* 431 U.S. at 217, 97 S.Ct. at 1790.

advanc[ing] political programs, [are] not [for] a use which helps defray the expenses of the negotiation or administration of collective agreements, or the expenses entailed in the adjustment of grievances and disputes." *Id.* at 768, 81 S.Ct. at 1800. As a result, it held the challenged expenses not chargeable. *Id.* at 768–69, 81 S.Ct. at 1799–1800. As had *Hanson, Street* eschewed going beyond the actual challenged expenditures before it, stating that "[w]e are not called upon to delineate the precise limits of th[e] power [to charge dues] in this case." *Id.* at 768, 81 S.Ct. at 1800.

Between *Street* and *Ellis,* which was decided in 1984, the Supreme Court laid down in *Allen* and *Abood* the rules of pleading and burden of proof to be followed in alleging a proper cause of action contesting the propriety of charging an impermissible expenditure in the agency collective bargaining context. Plaintiffs in *Allen* alleged that some of the dues exacted from them under the agency contract "have been and are and will be regularly and continually used by the defendant Unions to carry on, finance and pay for political activities directly at cross-purposes with the free will and choice of the plaintiffs." *Allen,* 373 U.S. at 118, 83 S.Ct. at 1161. The Court held that "[t]his allegation sufficiently states a cause of action," because "[i]t would be impracticable to require a dissenting employee to allege and prove each distinct union political expenditure to which he objects; it is enough that he manifests his opposition to *any* political expenditures by the union." *Id.* (emphasis in original). The Court reasoned that "[s]ince the unions possess the facts and records from which the proportion of political to total union expenditures can reasonably be calculated, basic considerations of fairness compel that they, not the individual employees, bear the burden of proving such proportion." *Id.* at 122, 83 S.Ct. at 1163. This ruling in *Allen* was reaffirmed in *Abood:*

> But in holding that as a prerequisite to any relief each appellant must indicate to the Union the *specific* expenditures to which he objects, the Court of Appeals ignored the clear holding of *Allen.* As in *Allen,*

the employees here indicated in their pleadings that they opposed ideological expenditures of *any* sort that are unrelated to collective bargaining. To require greater specificity would confront an individual employee with the dilemma of relinquishing either his right to withhold his support of ideological causes to which he objects or his freedom to maintain his own beliefs without public disclosure. It would also place on each employee the considerable burden of monitoring all of the numerous and shifting expenditures made by the Union that are unrelated to its duties as exclusive bargaining representative.

*Abood,* 431 U.S. at 241, 97 S.Ct. at 1802 (footnote omitted).[7]

*Ellis,* decided almost twenty years after *Abood,* was a critical step in the development of the case law in this area because it was the first decision to give real substance to the chargeability analysis that the Court initiated in *Hanson* and *Street.* The Court in *Ellis* indicated that its prior opinions on chargeability had established the polar extremes in the chargeability analysis: expenses relating directly to a dissenting employee's collective bargaining agreement could be charged against him, while expenses for the union's political or ideological activities could not. *Id.* 466 U.S. at 447, 104 S.Ct. at 1891. At the same time, the Court recognized that its prior cases had not required it to address the chargeability of the plethora of union expenses falling between these two extremes; it had gone no further than to state simply that such expenses were chargeable if they were "germane" to collective bargaining. *Id.*

Before proceeding to evaluate the chargeability of several such expenses under Section 2, Eleventh of the RLA, the Court elected to define more explicitly its "germaneness" standard:

> [T]he test must be whether the challenged expenditures are necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues. Under this

---

7. The Supreme Court in *Abood* also held that there was no real difference between collective bargaining in the public and private sectors for

constitutional purposes. *Abood,* 431 U.S. at 230, 97 S.Ct. at 1796.

standard, objecting employees may be compelled to pay their fair share of not only the direct costs of negotiating and administering a collective-bargaining contract and of settling grievances and disputes, but also the expenses of activities or undertakings normally or reasonably employed to implement or effectuate the duties of the union as exclusive representative of the employees in the bargaining unit.

*Id.* at 448, 104 S.Ct. at 1892.

The first expense to which the Court applied this test was for "conventions." The conventions for which dissenters were charged were "national convention[s] at which the members elect[ed] officers, establish[ed] bargaining goals and priorities, and formulate[d] overall union policy." *Id.* The Court found that these conventions allowed the union to "maintain its corporate and associational existence, ... elect officers to manage and carry on its affairs, and ... consult its members about overall bargaining goals and policy." *Id.* Such things related to collective bargaining in each local unit because they "guide[d] the union's approach to collective bargaining" and increased "its effectiveness in negotiating labor agreements." *Id.* at 449, 104 S.Ct. at 1892 (quotations omitted). The Court concluded that this relationship to "the union's discharge of its duties as bargaining agent," *id.*, was sufficiently close to allow the union to charge their expenses against dissenters. *Id.* at 448, 104 S.Ct. at 1892.

The Court next analyzed the chargeability of expenses of the national union for social activities. These social activities expenses had "go[ne] toward purchasing refreshments for union business meetings and occasional social activities." *Id.* at 449, 104 S.Ct. at 1893. The Court found that "[l]ike conventions, social activities [were] a standard feature of union operations." *Id.* at 450, 104 S.Ct. at 1893. "While these affairs [were]

not central to collective bargaining," *id.* at 449, 104 S.Ct. at 1893, the Court determined that they did relate to it "because they br[ought] about harmonious working relationships, promote[d] closer ties among employees, and create[d] a more pleasant environment for union meetings," *id.* at 449–50, 104 S.Ct. at 1893. It held that this was a sufficiently close relationship to collective bargaining to allow unions to charge these *"de minimis"* expenses, *id.* at 450, 104 S.Ct. at 1893, to dissenting employees, *id.* at 449, 104 S.Ct. at 1893.

The Court then turned to expenses for "publications." The national union "put[ ] out a monthly magazine" for all the employees in each of its local unions,[8] and charged dissenting employees for the portion of its costs that were attributed to articles "concerning collective bargaining, contract administration, and employees' rights." *Id.* at 450, 104 S.Ct. at 1893 (quotations omitted). The Court found that publication of such articles related to the collective bargaining of each dissenter's unit because the articles were "the union's primary means of communicating information concerning [such matters]," which were related to collective bargaining. *Id.* (quotations omitted). The Court decided that such a relationship to collective bargaining was sufficient to allow these expenses to be charged against dissenters. *Id.* at 451, 104 S.Ct. at 1893. It made clear, however, that publications expenditures for articles not relating to collective bargaining, contract administration, or employees' rights were not chargeable. *Id.*

The Court also considered the chargeability of expenses incurred by the union for "organizing" and "litigation" outside the dissenting employee's collective bargaining unit, and found them to be of a different character than expenses for conventions, social activities, or publications. It acknowledged that expenses on organizing in another unit bore at least an "attenuated connection" to collec-

---

**8.** In the union involved in *Ellis,* the Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees, the national union is referred to as the "Grand Lodge" and the local unions are referred to as "Local Lodges." *Ellis v. Brotherhood of Ry., Airline & S.S. Clerks, Freight Handlers, Ex-* *press & Station Employees,* 685 F.2d 1065, 1068 (9th Cir.1982), *rev'd,* 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984). The publication expenses, as well as the social expenses that are addressed *infra,* were expenses of the Grand Lodge.

tive bargaining in the dissenter's unit because the "organizing efforts [were] aimed toward a stronger [national] union, which in turn would be more successful at the bargaining table." *Id.* at 451, 104 S.Ct. at 1894. The Court found, however, that this relationship to collective bargaining in the dissenter's unit was not sufficiently close to sustain the chargeability of expenses for extra-unit organizing under section 2, Eleventh for two reasons. *Id.* First, the benefit to collective bargaining gained by extra-unit organizing is secured only through "the overall expansion of union power" and expanding union power was not the purpose of section 2, Eleventh, which limits chargeable activities to those matters germane to the union's duties as exclusive bargaining representative. *Id.* at 451–52, 104 S.Ct. at 1893–94. Second, while "it may be that employees will ultimately ride for free on the union's organizing efforts outside the bargaining unit," *id.* at 452, 104 S.Ct. at 1894, free riding on these benefits is not the type of free riding that Section 2, Eleventh seeks to prevent, *id.* at 452–53, 104 S.Ct. at 1894–95.

The court addressed the chargeability of litigation expenses similarly and its conclusion was equally clear: "The expenses of litigation incident to negotiating and administering the contract or to settling grievances and disputes" and of certain other types of litigation were chargeable to dissenters *only* if the litigation arose within the dissenters' unit. *Id.* at 453, 104 S.Ct. at 1894. "The expenses of litigation not having such a connection with the bargaining unit are not to be charged to objecting employees." *Id.*

Having determined that the RLA permitted the union to charge dissenters for these conventions, social activities and publications, the Court addressed whether these charges violated the First Amendment and determined that they did not. It stated that forcing dissenters to contribute to union social hours does not "trigger First Amendment protection" because

> the communicative content [of being forced to contribute to these activities] is not inherent in the act [of contributing], but stems from the union's involvement in it. The objection is that these are *union* social hours. Therefore, the fact that the employee is forced to contribute does not increase the infringement of his First Amendment rights already resulting from the compelled contribution to the union [that is inherent in allowing the union shop].

*Id.* at 456, 104 S.Ct. at 1896 (emphasis in original). The Court concluded that charges for the *union* conventions and publications distributed only to *union* members were constitutionally permissible for the same reason. *Id.* While both of these activities "have direct communicative content and involve the expression of ideas," the Court "perceived little additional infringement of First Amendment rights beyond that already accepted" because this "communicative content" and "expression of ideas" was not in any way directed outside of the union. *Id.*

The Court's most recent decision relating to the issues here was *Lehnert.*[9] In *Lehnert,* the employer was a public educational institution established under Michigan law. An affiliate of the Michigan Educational Association and the National Educational Association, the defendant Ferris Faculty Association ("FFA"), was the exclusive bargaining agent of the members of the faculty of FFA. The plaintiffs were members of the faculty of FFA and, as such, were subject to the pay-

---

9. After *Ellis* and prior to *Lehnert,* the Court decided *Beck,* a case which arose in our Circuit. *Beck* addressed the chargeability of certain expenses under Section 8(a)(3) of the NLRA, which is interpreted identically with Section 2, Eleventh. It is relevant to the case at bar for two reasons. First, the Court there strongly reaffirmed the "germaneness" test that the majority and concurring opinions would destroy. The Court stated: "The statutory question presented in this case, then, is whether [a dissenter's obligation to support the union] includes the obligation to support union activities beyond those *germane* to collective bargaining, contract administration, and grievance adjustment. We think *it does not.*" *Beck,* 487 U.S. at 745, 108 S.Ct. at 2648. Second, we had held that expenditures by a communications union to support a strike by the United Mine Workers were not chargeable to dissenting employees in the communications union. The union sought, and was granted, certiorari, but did not request review of our decision on this point; our decision that the payments to the United Mine Workers were not chargeable is, thus, the law in this Circuit.

ment of dues as set by the union for members of the Association. These faculty members objected to being charged by the union for the costs of (1) lobbying and electoral politics; (2) bargaining, litigation, and other activities on behalf of persons not in petitioners' bargaining unit; (3) public relations efforts; (4) miscellaneous professional activities; (5) meetings and conventions of the parent unions; and (6) preparation for a strike by the FFA which, had it materialized, would have violated Michigan law. The lower court had held that all the challenged charges were "sufficiently related to the union's duties as the exclusive bargaining representative ... to justify compelling petitioners to assist in subsidizing [them]." *Id.,* —— U.S. at ——, 111 S.Ct. at 1956.

The Supreme Court, after reviewing the earlier relevant Supreme Court decisions, declared that in determining which expenditures may be charged by the bargaining representative against dissenting employees in the bargaining unit, the Court should engage in a "case-by-case analysis" of each charge. *Id.* at ——, 111 S.Ct. at 1959. In applying this analysis, the Court stated that to be chargeable against dissenting employees the costs "must (1) be 'germane' to collective-bargaining activity; (2) be justified by the government's vital policy interest in labor peace and avoiding 'free riders'; and (3) not significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop." *Id.*

In following those instructions, the Court first held that even in the case of public employees whose salaries are fixed to some extent politically, where "lobbying activities relate not to the ratification or implementation of a dissenter's collective-bargaining agreement, but to financial support of the employee's profession or of public employees generally, the connection to the union's function as bargaining representative is too attenuated to justify compelled support by objecting employees." *Id.* at ——, 111 S.Ct. at 1959–60. It invalidated such "assessments for political activities outside the scope of the collective-bargaining context" in part because they "would present 'additional interference with the First Amendment interests of objecting employees.'" *Id.* at ——, 111 S.Ct.

at 1960 (quoting *Ellis,* 466 U.S. at 456, 104 S.Ct. at 1896).

Somewhat similar to the charge for "lobbying" was one covering (1) the costs of a program to secure funds supporting public education in Michigan, a program which could be expected to increase financial assistance to the academic program at Ferris State College, and (2) that portion of a MEA publication reporting the progress of the program. Although, arguably, these costs might "ultimately benefit" to some extent the members of FFA, the Court responded firmly to the claim of chargeability for such activities that "none [of these charges] may be supported through the funds of objecting employees" because "[n]one of these activities was shown to be oriented toward the ratification or implementation of petitioner's collective-bargaining agreement." *Id.* at ——, 111 S.Ct. at 1963. It should be noted that the language of Justice Blackmun in this instance, as well as his conclusion in the previous instance of "lobbying," was not an expression of a perfunctory opinion. Justice Marshall dissented specifically because of the majority opinion's reason for disallowing this charge (*i.e.,* that it was not "oriented toward the ratification or implementation of a petitioner's collective bargaining agreement").

The cost of litigation, which the union sought to charge against dissenters, provides an important ruling that relates directly to the case at bar. "Litigation costs" were discussed in connection with the claimed "allowance of several activities that the union did not undertake directly on behalf of persons within petitioners' bargaining unit." *Id.* at ——, 111 S.Ct. at 1963. Some of these activities embraced "general collective-bargaining costs of the state or national parent union." *Id.* These the Court approved. The Court found that "[t]his rationale d[id] not extend, however, to the expenses of litigation that does not concern the dissenting employees' bargaining unit or, by extension, to union literature reporting on such activities." *Id.* The Court added:

> While respondents are clearly correct that precedent established through litigation on behalf of one unit may ultimately be of some use to another unit, we find extra-

unit litigation to be more akin to lobbying in both kind and effect. We long have recognized the important political and expressive nature of litigation. See, *e.g.*, *NAACP v. Button*, 371 U.S. 415, 431, 83 S.Ct. 328, 337, 9 L.Ed.2d 405 (1963) (recognizing that for certain groups, "association for litigation may be the most effective form of political association"). Moreover, union litigation may cover a diverse range of areas from bankruptcy proceedings to employment discrimination. See *Ellis*, 466 U.S. at 453, 104 S.Ct., at 1894. When unrelated to an objecting employee's unit, such activities are not germane to the union's duties as exclusive bargaining representative. Just as the Court in *Ellis* determined that the RLA, as informed by the First Amendment, prohibits the use of dissenters' fees for extra-unit litigation, *ibid.*, we hold that the Amendment proscribes such assessments in the public sector. *Id.* at ———–———, 111 S.Ct. at 1963–64.

"Strike benefits" was a large item in the charges made against the dissenters by the union bargaining agent. This issue arose in this case at a time when the FFA was "engaged in negotiating a new collective-bargaining agreement." *Id.* at ———, 111 S.Ct. at 1965. The negotiation proceedings appeared to be making little progress, and for that reason the union was proceeding "to go out on strike" as a means of promoting progress in the negotiations. *Id.* The Court of Appeals had asserted that the rationale for charging the costs of these preparations ratably against the dissenting employees was that "such expenditures fall within the range of reasonable bargaining tools available to a public sector union during contract negotiations." *Id.* The Court accepted this rationale, declaring that, "[i]n sum, these expenses are substantively indistinguishable from those appurtenant to collective-bargaining negotiations." *Id.* It is manifest that this ruling was in the context of a period of actual contract negotiations involving the very unit of which the dissenting employees-plaintiffs were members.

Finally, the Court of Appeals had approved certain" [p]ublic relations expenditures designed to enhance the reputation of the teaching profession." *Id.* at ———, 111

S.Ct. at 1964. The Court, however, disagreed, stating:

[P]ublic speech in support of the teaching profession generally is not sufficiently related to the union's collective-bargaining functions to justify compelling dissenting employees to support it. Expression of this kind extends beyond the negotiation and grievance-resolution contexts and imposes a substantially greater burden upon First Amendment rights than do the latter activities.

*Id.* The Court went on to dismiss the reasoning of the Court of Appeals, which would liken these changes to certain of the "*de minimis* " charges approved in *Ellis*. It rejected the analogy, saying that any such rule would not extend to the public relations charges asserted by the union in *Lehnert*, which "covered informational picketing, media exposure, signs, posters and buttons." *Id.*

*Ellis* and *Lehnert* make clear that chargeability analysis under both the RLA and the Constitution is driven by whether compelling contributions for the activity at issue implicates dissenters' First Amendment rights. Whether First Amendment rights are implicated is driven, in turn, by whether the activity has "communicative content" outside of the union. *Ellis* recognized that union conventions, publications distributed only to union members, and union social activities had no communicative content outside the union, *Ellis*, 466 U.S. at 456, 104 S.Ct. at 1896, and it allowed the union to charge dissenters for these activities merely by showing that they related to collective bargaining in the dissenters' unit in such small ways as "bringing about harmonious working relationships," *id.* at 449, 104 S.Ct. at 1893, and "maintain[ing] [the union's] corporate or associational existence," *id.* at 448, 104 S.Ct. at 1892. On the other hand, extra-unit organizing and litigation, which clearly had communicative content outside of the union, could not be charged against dissenting employees even though the Court acknowledged that they had at least an "attenuated connection" to the dissenters' collective bargaining. *Id.* at 451, 104 S.Ct. at 1894.

*Lehnert* explicitly recognized that expenses for activities that have no communicative content outside of the union, which it termed "nonideological expenses," are to be given different treatment in the chargeability analysis:

> While we consistently have looked to whether *nonideological* expenses are "germane to collective bargaining," ... we have never interpreted that test to require a direct relationship between the expense at issue and some tangible benefit to the dissenters' bargaining unit.
>
> . . . .
>
> The Court recognized as much in *Ellis.* There it construed the RLA to allow the use of dissenters' funds to help defray the costs of the respondent union's national conventions. It reasoned that "if a union is to perform its statutory functions, it must maintain its corporate or associational existence, must elect officers to manage and carry on its affairs, and may consult its members about overall bargaining goals and policy." ... We see no reason why analogous public sector union activities should be treated differently.
>
> We therefore conclude that a local bargaining representative may charge objecting employees for their pro rata share of costs associated with the otherwise chargeable activities of its state and national affiliates, even if those activities were not performed for the direct benefit of the objecting employees' bargaining unit. This conclusion, however, does not serve to grant a local union *carte blanche* to expend dissenters' dollars for bargaining activities wholly unrelated to the employees in their unit.... There must be some indication that the payment is for services that may ultimately enure to the benefit of the members of the local union by virtue of their membership in the parent organization.

*Lehnert,* —— U.S. at —— – ——, 111 S.Ct. at 1961–62 (emphasis added) (citations and footnotes omitted). In other words, "non-ideological" expenses may be charged against dissenting employees on the mere showing that they "may ultimately enure to the benefit of the members of the local union by virtue of their membership in the parent organization." *Id.*

The Court approved on this basis the union's charges for "informational support services" that informed union members about "teaching and education generally, professional development, unemployment, job opportunities, award programs of the MEA, and other miscellaneous matters" because these services were "neither political nor public in nature" and were "comparable" to the social activities in *Ellis. Id.* at ——, 111 S.Ct. at 1964. The Court also approved the union's charges for its national conventions under this lenient rule. *Id.* at —— – ——, 111 S.Ct. at 1964–65.

The expenses addressed by the Court that had communicative content outside of the union were not analyzed under this rule and were accorded stricter treatment. Extra-unit litigation, which the Court found "political and expressive," could not be charged against dissenters despite the fact that "precedent established through litigation on behalf of one unit may ultimately be of some use to another unit." *Id.* at ——, 111 S.Ct. at 1963. Similarly, the Court found that public-relations activities involving "informational picketing, media exposure, signs, posters and buttons" had "communicative content" that did not "derive solely from the union's involvement in them" and held such activities not chargeable even though they were clearly of some benefit to dissenters' collective bargaining. *Id.* at ——, 111 S.Ct. at 1964. The only activity with communicative content directed outside the union that the Court found could be charged against dissenters was preparation for a strike in the dissenters' unit because it was "within the range of reasonable bargaining tools available to a ... union during contract negotiations." *Id.* at ——, 111 S.Ct. at 1965.

### III.

I have reviewed the facts and the applicable law in this case, and turn now to applying that law to the expenditures at issue here. These expenditures are best divided into three groups: expenditures for the Continental and United strikes that were incurred on litigation, expenditures for the strike and threatened strike at Eastern, and expendi-

tures for the Continental and United strikes that were not incurred on litigation. I will address each group in turn.

### A.

I begin by addressing the union's charges for the litigation in connection with the United and Continental strikes for two reasons. First, counsel for ALPA and counsel for *amicus*, both of whom, as I mentioned earlier, are very experienced in labor litigation, gave special prominence and consideration in their briefs to the issue of whether these charges were proper. Second, the justification offered by ALPA to its members and non-members in demanding additional assessments for its Major Contingency Fund was that it had incurred heavy litigation expenses in connection with the Continental and United strikes. This makes evident that these litigation expenditures were substantial and relevant, which is reaffirmed by the abundance of references to them in the Appendix herein. *See* App. at 86, 98, 99, 110A, 121, 126, 128.

Both *Ellis* and *Lehnert* establish, in as clear terms as are possible, an unqualified rule that charges for extra-unit litigation expenses are improper. *Ellis*, 466 U.S. at 453, 104 S.Ct. at 1894; *Lehnert*, —— U.S. at ——–——, 111 S.Ct. at 1963–64. ALPA is divided into separate units by airline. The union at each airline elects its own negotiating representatives and negotiates its collective bargaining agreement with its airline employer separately from the union at other airlines. The record shows that in a number of instances the agreements reached by the union at different airlines have had different provisions. As a result, regardless of the fact that these negotiating representatives have certain interactions with each other and with ALPA, ALPA's organization is not materially different from the organization of the unions in *Ellis* or *Lehnert*, which the court found to be composed of separate units. Charges were assessed against plaintiffs, most of whom are pilots from units other

than United and Continental, for expenditures on litigation in connection with strikes at United and Continental.[10] Such charges are clearly both statutorily and constitutionally improper under *Ellis* and *Lehnert*. I would, therefore, reverse the district court's holding with respect to these charges.

Neither the district court, nor the majority, nor the concurrence address these litigation expenses. The district court and the concurrence do not even acknowledge that they were charged against the plaintiffs and the majority concludes that the plaintiffs did not put their validity in issue. Given the rules of pleading in *Allen* and *Abood* and the Court's clear rule that extra-unit litigation is not chargeable, it is incredible that the district court allowed these substantial extra-unit litigation charges without comment. Even more incredible is the action of the majority and concurrence who, despite having the benefit of both *Ellis* and *Lehnert*, affirm the district court's holding allowing these charges.

The union seeks to persuade us to find these extra-unit litigation expenses chargeable by suggesting that Justice Blackmun's opinion in *Lehnert* is not the majority opinion on the issue of extra-unit litigation. It reasons that only Justices Rehnquist, White, and Stevens join Justice Blackmun on this issue, and that the concurring and dissenting opinions written by Justices Scalia, Marshall and Kennedy for the rest of the Court indicate that they would allow charges for extra-unit litigation. While the union's suggestion is creative, it is not persuasive as Justice Scalia began his opinion by stating that he "would hold that contributions can be compelled only for the costs of performing the union's statutory duties as exclusive bargaining agent." *Lehnert*, —— U.S. at ——, 111 S.Ct. at 1975 (Scalia, J. dissenting). Quite clearly, supporting litigation in other units is not a "duty" that the RLA required the union here to perform.

---

**10.** Obviously, litigation expenses incurred in connection with the United strike were not extra-unit expenses with respect to plaintiffs who were United pilots. However, as no Continental pilots are plaintiffs in this case, these expenses are extra-unit expenses for all plaintiffs except those that are United pilots.

## B.

I addressed in detail in my introductory statements the chargeability of the union's expenditures for the threatened strike and strike at Eastern. Analyzing these expenditures independently from the expenditures for the strikes at United and Continental, as *Lehnert* requires us to do, *id.* at ——, 111 S.Ct. at 1959, no court could conclude that the union has met its burden, under *Allen* and *Abood*, of showing that these expenses are chargeable because there is literally nothing in the record either explaining the Eastern controversy or showing why the controversy affected the union's collective bargaining duties. Moreover, it is highly probable the union could not, as a matter of law, make the required showing because plaintiffs stated at oral argument that the Eastern strike was a sympathy strike and charging dissenters for expenditures to support a sympathy strike would be statutorily and constitutionally impermissible. *See Beck*, 776 F.2d at 1212. Thus, I would also reverse the district court's holding with respect to the charges for the strike and threatened strike at Eastern.

## C.

The expenditures for the Continental and United strikes that were not incurred for litigation connected with these strikes must be addressed under the chargeability analysis of *Ellis* and *Lehnert*. *Ellis* and *Lehnert* allow unions to charge dissenters for "nonideological expenses" if the activities on which these activities are incurred "may ultimately enure to the benefit of the members of the local union." *Lehnert*, —— U.S. at —— ——, 111 S.Ct. at 1961–62. However, expenses for activities that have "communicative content" directed outside of the union are more difficult to charge. In addressing such expenses, the Court has found that expenses for extra-unit litigation, *Ellis*, 466 U.S. at 453, 104 S.Ct. at 1894; *Lehnert*, —— U.S. at —— – ——, 111 S.Ct. at 1963–64, for extra-unit organizing of non-members, *Ellis*, 466 U.S. at 451–53, 104 S.Ct. at 1893–95, and

for public-relations activities involving "informational picketing [and] media exposure," *Lehnert*, —— U.S. at ——, 111 S.Ct. at 1964, are not sufficiently related to collective bargaining in the dissenter's unit to be chargeable, while expenses for a threatened strike in the dissenter's unit during contract negotiations are sufficiently related, *id.* at ——, 111 S.Ct. at 1965.

The union's expenditures for strikes at United and Continental are not the type of "nonideological expenses" the Court contemplated in *Lehnert* because the strikes clearly have "communicative content" that is directed outside the union. The strikes are, thus, unlike the union conventions, union social activities, union informational support services for union members, or union publications distributed to union members; instead, they are similar to union litigation, organization, and union public-relations activities involving picketing and media exposure. Therefore, their chargeability is not properly analyzed under the standard of whether they "may ultimately enure to the benefit of the members of the local union," but under the Court's more difficult chargeability standard.

Under this standard, the expenses for the strikes at United and Continental are not chargeable. For the majority of plaintiffs, these are extra-unit strike expenses. *See* note 10 *supra*. In *Lehnert* and *Ellis*, the Court addressed several expenses for extra-unit activities that had communicative content outside of the union, including expenses for extra-unit litigation, extra-unit organizing, and public-relations activities by the national union involving picketing and media exposure. It found every one of these expenses to be not chargeable against the dissenting employees. I can see no reason why the expenses here for extra-unit strikes should be distinguished from all of the other expenses the Court has addressed for extra-unit activities with communicative content outside the union, and particularly no reason why they should be distinguished from extra-unit litigation.[11]

---

**11.** As I indicated in my introductory statements, *Lehnert's* discussion of strike preparation expenses is not applicable to the strike expenses

here because it was confined to addressing only strike preparation within the dissenters' unit.

Moreover, *Lehnert* specifically held that a union could not charge for activities that had the kind of relationship to bargaining in the dissenters' units that these strikes had. These strikes are related to bargaining in the dissenters' units because each contract in the industry serves as precedent for future contracts and, thus, a strike in one unit directly affects collective bargaining in the other units in the industry. *Lehnert*, however, held that extra-unit litigation, which has this same kind of relationship to collective bargaining in the dissenters' units, was not chargeable. It stated that "[w]hile respondents are clearly correct that precedent established through litigation on behalf of one unit may ultimately be of some use to some other unit," extra-unit litigation is not chargeable because it is "not germane to the union's duties as exclusive bargaining representative." *Id.* at —— ——, 111 S.Ct. at 1963–64.

In sum, I would reverse the district court's holding that the expenses for the strikes at United and Continental were chargeable.[12]

The majority and the concurrence only avoid this result by taking a single, isolated sentence in *Lehnert* and adopting it as a standard for determining the chargeability of all extra-unit expenses. As I indicated in my discussion of the law, this sentence—"There must be some indication that the payment is for services that may ultimately enure to the benefit of the members for the local union by virtue of their membership in the parent organization"—only applies to the chargeability of expenses for "nonideological" activities that have no communicative content directed outside the union. Ironically, the Court intended the sentence to limit the chargeability of expenses for activities with no communicative content outside of the union, not, as the majority and concurrence interpret it, to expand immensely the charge-ability of all extra-unit expenses. As I indicated in my introductory statements, the majority's and the concurrence's interpretation of the sentence as establishing a standard for the chargeability of all extra-unit expenses is belied by the facts that (1) *Lehnert* itself did not apply the sentence as a standard for all the extra-unit expenses before it and (2) this standard would fundamentally alter the chargeability standard of "germaneness" that the Court has used in all of its cases relating to this issue and that *Lehnert* itself explicitly adopted.[13]

## IV.

In conclusion, I would hold that none of the union's expenditures at issue in this case may be charged against the plaintiffs and would, thus, reverse the district court's decision on all of these charges.

Judge WIDENER, Judge NIEMEYER, Judge HAMILTON, and Judge LUTTIG join in this dissent.

12. I stated in Part B *supra* that I would hold the expenses on the Eastern strike and threatened strike not chargeable because the union did not meet its burden of showing otherwise. I explain here that, under *Ellis* and *Lehnert*, no expenses for extra-unit strikes are chargeable. This is a second reason why the expenses on the Eastern strike are not chargeable.

13. The concurring opinion indicates that it would only apply this standard to "nonideological" extra-unit expenses. It does not elaborate, however, on the meaning of "nonideological" and summarily holds that the strike expenses here are "nonideological" expenses. The concurring opinion is correct that this standard applies only to "nonideological" expenses. However, it fails to note that "nonideological" expenses are expenses for activities that have no communicative content directed outside of the union; they are not some broader, amorphous category into which these strike expenses may be placed.