John L. **LANCASTER**, Plaintiff–
Appellant,

v.

**AIR LINE PILOTS ASSOCIATION IN-
TERNATIONAL; United Airlines,
Inc., Defendants–Appellees.**

No. 94–1467.

United States Court of Appeals,
Tenth Circuit.

Feb. 21, 1996.

Robert F. Gore (Jerre W. Dixon of Dixon & Snow, Denver, Colorado, with him on the briefs), National Right to Work Legal Defense Foundation, Inc., Springfield, Virginia, for Plaintiff–Appellant.

James K. Lobsenz (Gary Green, with him on the brief), Air Line Pilots Association, International, Washington, D.C., for Defendant–Appellee Air Line Pilots Association, International.

Chris A. Hollinger (Robert A. Siegel of O'Melveny & Myers, Los Angeles, California; Paul F. Lewis and Jerry N. Jones of Moye, Giles, O'Keefe, Vermeire & Gorrell, Denver, Colorado, with him on the brief), O'Melveny & Myers, Los Angeles, California, for Defendant–Appellee United Air Lines, Inc.

Before BALDOCK, BRORBY and SETH, Circuit Judges.

BRORBY, Circuit Judge.

Plaintiff John L. Lancaster appeals the district court's order granting summary judgment in favor of defendants United Airlines, Inc. (hereafter "United") and the Air Line Pilots Association (hereafter "ALPA") on his claims ALPA and United violated § 2, Eleventh, of the Railway Labor Act, 45 U.S.C. § 152, Eleventh, and the First and Fifth Amendments by requiring, as a condition of employment, that he pay an assessment to support ALPA members working at Eastern Airlines (hereafter "Eastern") while they were striking in sympathy with members of the International Association of Machinists and Aerospace Workers Union (hereafter "the Machinists") at Eastern, and by terminating him for failing to pay the assessments within the time allowed. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and reverse.

## I

The collective bargaining agreement between ALPA and United creates an agency shop. "An 'agency shop' agreement generally provides that while employees are not required to join the union, they are required to pay the union an amount equal to union dues." *Pilots Against Illegal Dues v. Air Line Pilots Ass'n.*, 938 F.2d 1123, 1126 & n. 1 (10th Cir.1991). Mr. Lancaster joined ALPA shortly after he began working for United in the 1960's, but later resigned his membership. Throughout the period relevant to this litigation, he continued to pay the agency fees required under the collective bargaining agreement.

In 1989, members of the Machinists Union and its subordinate unions at Eastern went on strike. ALPA authorized its members at Eastern to strike in sympathy with the Machinists. From May 1989 to March 1990, ALPA levied a monthly strike assessment on all its members, including those working at United. ALPA also required Mr. Lancaster and the other nonunion pilots at United to pay strike assessments pursuant to the collective bargaining agreement with United. Mr. Lancaster continued to pay his other obligations to ALPA, but did not pay the strike assessment.

In January 1993, ALPA asked United to terminate Mr. Lancaster for failing to pay the strike assessment. Mr. Lancaster learned of ALPA's request and delivered a check for the full amount due. ALPA refused to accept the check because it was untimely and returned it to Mr. Lancaster. United then informed Mr. Lancaster he was to be terminated "pursuant to United's contractual obligations" under the collective bargaining agreement. Mr. Lancaster filed a timely grievance with United's Senior Vice President of Human Resources, pursuant to the collective bargaining agreement. Mr. Lancaster did not contend in his grievance that the Eastern sympathy strike assessment violated the Railway Labor Act or the First and Fifth Amendments. United rejected Mr. Lancaster's grievance. Mr. Lancaster timely appealed the matter to arbitration before a neutral referee, again pursuant to the collective bargaining agreement. He again failed to raise his Railway Labor Act and constitutional challenges to the Eastern sympathy strike assessment. After a hearing, the referee denied Mr. Lancaster's appeal, and,

shortly thereafter, United terminated Mr. Lancaster's employment.

Mr. Lancaster then filed a complaint in district court alleging (1) ALPA breached its duty of fair representation, (2) United breached his employment contract, (3) ALPA and United violated § 2, Eleventh, of the Railway Labor Act, 45 U.S.C. § 152, Eleventh, by requiring him to pay the strike assessment and terminating him for failing to do so, and (4) ALPA and United violated his First Amendment right to freedom of speech and association and his Fifth Amendment right to due process by requiring him to pay the strike assessment and terminating him for failing to do so within the time allowed. The district court granted summary judgment in favor of ALPA and United. This appeal followed.

## II

Mr. Lancaster contends the district court erred in granting summary judgment in favor of ALPA and United on his claim they violated § 2, Eleventh, of the Railway Labor Act, 45 U.S.C. § 152, Eleventh, and the First and Fifth Amendments by terminating him for failing to pay the Eastern sympathy strike assessment.[1] Congress added § 2, Eleventh, to the Railway Labor Act in 1951. Pub.L. No. 81-914, 64 Stat. 1238. The purpose of the amendment was to

permit a carrier and a labor organization ... to enter into an agreement requiring, as a condition of continued employment, that within 60 days following the beginning of such employment, or the effective date of such agreement, whichever is the later, all employees shall become members of the labor organization representing the craft or class of such employees.

S.Rep. No. 2262, 81st Cong., 2d Sess. 2 (1950) U.S.Code Cong. & Admin.News 1950 pp. 4319, 4320. This arrangement is commonly referred to as a "union shop." *Id.* Since 1951, § 2, Eleventh, has been interpreted as allowing "agency shop" arrangements as well. *See, e.g., Brotherhood of Ry. & S.S. Clerks v. Allen,* 373 U.S. 113, 116 & n. 2, 83 S.Ct. 1158, 1160 & n. 2, 10 L.Ed.2d 235 (1963); *Pilots Against Illegal Dues,* 938 F.2d at 1126 & n. 1 (10th Cir.1991).

By its terms, § 2, Eleventh, gives unions broad authority to exact "periodic dues, initiation fees, and assessments" from involuntary members, in the case of a union shop, or nonmembers, in the case of an agency shop, and prohibits only "fines and penalties." 45 U.S.C. § 152, Eleventh(b). As Senator Hill, one of the sponsors of the 1951 amendment, explained during the debates before the full Senate, the limitation on "fines and penalties" was included so that "if an individual

1. Section 2, Eleventh, of the Railway Labor Act, 45 U.S.C. § 152, Eleventh, provides in pertinent part:

Notwithstanding any other provisions of this chapter, or of any other statute or law of the United States, or Territory thereof, or of any State, any carrier or carriers as defined in this chapter and a labor organization or labor organizations duly designated and authorized to represent employees in accordance with the requirements of this chapter shall be permitted—

(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class: Provided, That no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member or

with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership.

(b) to make agreements providing for the deduction by such carrier or carriers from the wages of its or their employees in a craft or class and payment to the labor organization representing the craft or class of such employees, of any periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership: Provided, That no such agreement shall be effective with respect to any individual employee until he shall have furnished the employer with a written assignment to the labor organization of such membership dues, initiation fees, and assessments, which shall be revocable in writing after the expiration of one year or upon the termination date of the applicable collective agreement, whichever occurs sooner.

member is fined for some infraction of the union bylaws or constitution, the union cannot obtain his discharge under a union shop agreement in the event that the member refuses or fails to pay the fine imposed." 96 Cong.Rec. 15736 (1950). The legislative history of § 2, Eleventh, also suggests no other limitation was intended. "Indeed, several witnesses appearing before the congressional Committees objected to the absence of any explicit limitation on the scope or amount of fees and dues that could be compelled. That Congress enacted the provision over these objections arguably indicates that it was willing to tolerate broad exactions from objecting employees." *Ellis v. Brotherhood of Ry., Airline & S.S. Clerks,* 466 U.S. 435, 445–446, 104 S.Ct. 1883, 1890–1891, 80 L.Ed.2d 428 (1984) (footnote omitted).

Nevertheless, the Supreme Court has held both § 2, Eleventh, and the First and Fifth Amendments prohibit certain assessments from objecting nonmember employees. It first suggested § 2, Eleventh, limited more than exaction of "fines and penalties" in *Railway Employes' Dept. v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956). In that decision, the Supreme Court rejected a facial constitutional challenge to § 2, Eleventh, but stated in dictum that "[i]f 'assessments' are in fact imposed for purposes not germane to collective bargaining, a different problem would be presented" under the Due Process Clause of the Fifth Amendment, because the assessment might unduly interfere with the objecting employee's "liberty" interest in earning a living. *Hanson,* 351 U.S. at 235, 76 S.Ct. at 720 (footnote omitted). The Court also stated in dictum that "if the exaction of dues, initiation fees, or assessments is used as a cover for forcing ideological conformity or other action in contravention of the First Amendment," those assessments might be unconstitutional under that Amendment. *Id.* at 238, 76 S.Ct. at 721. The high court bore out the dicta in *Hanson* a short time later in *International Ass'n. of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), and *Allen,* 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235. In these cases, the Supreme Court held § 2, Eleventh, bars unions from using funds exacted from objecting nonmember employees to support political causes which the employee opposes. *Allen,* 373 U.S. at 118–19, 83 S.Ct. at 1161–1162; *Street,* 367 U.S. at 769–70, 81 S.Ct. at 1800–1801. The Court read the Railway Labor Act in this way because "[f]ederal statutes are to be so construed as to avoid serious doubt of their constitutionality." *Street,* 367 U.S. at 749, 81 S.Ct. at 1790. For the first time, in *Ellis,* the Supreme Court devised a test for determining whether a particular assessment violates § 2, Eleventh. It held:

> [T]he test must be whether the challenged expenditures are necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues. Under this standard, objecting employees may be compelled to pay their fair share of not only the direct costs of negotiating and administering a collective-bargaining contract and of settling grievances and disputes, but also the expenses of activities or undertakings normally or reasonably employed to implement or effectuate the duties of the union as exclusive representative of the employees in the bargaining unit.

*Ellis,* 466 U.S. at 448, 104 S.Ct. at 1892.

Most recently, in *Lehnert v. Ferris Faculty* Ass'n, 500 U.S. 507, 519, 111 S.Ct. 1950, 1959, 114 L.Ed.2d 572 (1991), the Supreme Court relied on *Hanson, Street, Allen,* and *Ellis* for the proposition that courts charged with deciding whether an assessment by a public sector union is constitutional must apply a "case-by-case analysis" using three "guidelines." To be constitutional, the assessments "must (1) be 'germane' to collective-bargaining activity; (2) be justified by the government's vital policy interest in labor peace and avoiding 'free riders'; and (3) not significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop." *Id.* We have since harmonized *Lehnert*'s three-part test for public-sector union assessments with *Ellis*'s test for private-sector union assessments, because "[t]hese same characteristics presumably are required for chargeable expenses under the Railway Labor Act, since the

Court has consistently interpreted the RLA to avoid serious doubt of the statute's constitutionality." *Pilots Against Illegal Dues,* 938 F.2d at 1127 (citing *Street,* 367 U.S. at 749, 81 S.Ct. at 1789). Thus, we apply the *Lehnert* three-part test both to determine whether an assessment violates § 2, Eleventh, of the Railway Labor Act and to determine whether an assessment violates the First and Fifth Amendments.

### III

■ Having placed the matter in context, we now turn to Mr. Lancaster's contention the district court erred in granting summary judgment in favor of United and ALPA on his claim the Eastern sympathy strike assessment violated § 2, Eleventh, of the Railway Labor Act, 45 U.S.C. § 152, and the First and Fifth Amendments. "We review the grant or denial of summary judgment *de novo,* applying the same legal standard used by the district court pursuant to Fed. R.Civ.P. 56(c)." *Wolf v. Prudential Ins. Co. of America,* 50 F.3d 793, 796 (10th Cir.1995). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law, Fed.R.Civ.P. 56(C).'" *Universal Money Ctrs., Inc. v. American Tel. & Tel. Co.,* 22 F.3d 1527, 1529 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 655, 130 L.Ed.2d 558 (1994) (quoting Fed.R.Civ.P. 56(c)). "When applying this standard, we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Applied Genetics Int'l., Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990).

As the district court recognized, whether the Eastern sympathy strike assessment levied against United's pilots was "germane to collective bargaining activity" depends on two fairly discrete subissues: first, whether the assessment was germane even though it financed a strike by ALPA members at Eastern, not United; and second, whether it was germane even though the sympathy strike was designed to support striking members of another union, the Machinists, rather than to further directly the Eastern pilots' own interests in collective bargaining. After deciding each subissue in ALPA's and United's favor, the district court stated with virtually no analysis that "though the parties' arguments focus almost exclusively on the germaneness issue, I find that the assessments by ALPA satisfy the two remaining *Lehnert* requirements."

■ The district court was correct to conclude that the first subissue in the germaneness inquiry must be resolved in ALPA's and United's favor. We have read *Lehnert* as holding that, at least as a general principle, a union can require employees in one collective bargaining unit to pay a share of the chargeable expenses incurred on behalf of another collective bargaining unit represented by the same union, even though the activities giving rise to the expenses "were not performed for the direct benefit of the objecting employees' bargaining unit." *Lehnert,* 500 U.S. at 524, 111 S.Ct. at 1961; *Pilots Against Illegal Dues,* 938 F.2d at 1127–29. This is so because "to require a direct relationship between the expense at issue and some tangible benefit to the dissenter's bargaining unit ... would 'ignore the unified-membership structure under which so many unions ... operate.'" *Pilots Against Illegal Dues,* 938 F.2d at 1128 (quoting *Lehnert,* 500 U.S. at 523, 111 S.Ct. at 1961). "The essence of the affiliation relationship is the notion that the parent will bring to bear its often considerable economic, political, and informational resources when the local is in need of them." *Lehnert,* 500 U.S. at 523, 111 S.Ct. at 1961. Because of this affiliation relationship, a fee assessed from an objecting employee at one company "contributes to the pool of resources potentially available ... for the bargaining unit's protection." *Id.*

The Fourth Circuit's decision in *Crawford v. Air Line Pilots Ass'n Int'l,* 992 F.2d 1295 (4th Cir.) (en banc), *cert. denied,* —— U.S. ——, 114 S.Ct. 195, 126 L.Ed.2d 153 (1993), further supports the district court's resolution of the first subissue. Among other things, the employee plaintiffs in *Crawford* challenged an assessment intended to sup-

port ALPA members striking at another airline. The Fourth Circuit, sitting en banc, affirmed the district court's finding the fees were germane under *Lehnert*. *Crawford*, 992 F.2d at 1300. It reasoned that

> ALPA's 'unified-membership structure,' [*Lehnert*, 500 U.S. at 523 111 S.Ct. at 1961], is even tighter than that of the union in *Lehnert*. As the district court found, negotiations at other airlines were not only germane to the bargaining process at each airline bargaining unit, but in essence determined the result of the bargaining process. Expenditures to prevent the extraction of concessions from ALPA by individual airlines handily meet the *Lehnert* test. Because support for the striking pilots was of crucial importance in establishing the union's bargaining position in each airline unit, the requirement that agency-fee objectors provide funds for the strike benefits was clearly justified by the bargaining pattern and practice in the airline industry.

*Id.*

■ In light of *Lehnert*, *Pilots Against Illegal Dues*, and *Crawford*, the mere fact the sympathy strike assessment levied against United's pilots financed ALPA's activities at Eastern rather than United does not, in itself, make it nongermane. This conclusion brings us to the second, and more important, subissue: whether the assessment was germane even though the sympathy strike was designed to support members of another union, the Machinists, rather than to further directly the Eastern pilots' own interest in collective bargaining. The Supreme Court has made it clear that unions do not have "*carte blanche* to expend dissenters' dollars for bargaining activities wholly unrelated to the employees in their unit[, but that t]here must be some indication that the payment is for services that may ultimately inure to the benefit of the members of the local union by virtue of their membership in the parent organization." *Lehnert*, 500 U.S. at 524, 111 S.Ct. at 1961. Thus, we must determine whether the Eastern sympathy strike assessments ultimately would have "inure[d] to the benefit" of Mr. Lancaster.

The District of Columbia Circuit considered this very issue in *Beckett v. Air Line Pilots Ass'n.*, 59 F.3d 1276 (D.C.Cir.1995), in which the plaintiff employee challenged the same Eastern sympathy strike assessment. The District of Columbia Circuit first emphasized that

> [a] sympathy strike differs from other kinds of strikes and a union's participation therein may be intended merely to express solidarity with the primary striking union rather than to advance its own collective bargaining objectives. If that was the case here, as may reasonably be inferred, then the sympathy strike assessments were not 'germane to collective-bargaining activity' or chargeable to the nonunion pilots.

*Beckett*, 59 F.3d at 1279–80 (citations omitted). Because the evidence, viewed in the light most favorable to the objecting employees, would support a judgment in their favor, the court reversed the grant of summary judgment in ALPA's favor and remanded for trial. *Id.* It also reversed the district court's conclusion the sympathy strike assessment satisfied *Lehnert*'s third requirement, because it may have "significantly add[ed] to the burdening of free speech that is inherent in the allowance of an agency or union shop," *Lehnert*, 500 U.S. at 519, 111 S.Ct. at 1959, "[g]iven the inherently expressive nature of a sympathy strike." *Beckett*, 59 F.3d at 1280.

We agree with the *Beckett* court's analysis. Therefore, the case turns on whether, in light of the evidence introduced in support of and in opposition to the cross-motions for summary judgment, there is a genuine issue of material fact whether the Eastern sympathy strike and the assessment that supporting it were intended merely to express solidarity with the Machinists, support unionism generally, or to advance some other goal not germane to collective bargaining, or whether the Eastern strike assessment was designed to advance, and was reasonably likely to advance ALPA's own collective bargaining objectives at United. *Beckett*, 59 F.3d at 1279–1280. In the district court, ALPA introduced uncontroverted evidence in the form of an affidavit by its president, J. Randolph Babbitt, explaining the Eastern sympathy strike

assessment as follows: Texas Air Corporation, controlled by Frank Lorenzo, took over Eastern in 1986. After Mr. Lorenzo took over Eastern, "the events at Eastern ... followed a pattern Lorenzo established at Continental Airlines when [Texas Air] acquired [Continental]." At Continental, Mr. Lorenzo had repudiated collective bargaining agreements with ALPA and the Machinists, and other unions, reduced wages and benefits by fifty percent, and eventually eliminated the major unions from Continental. Mr. Lorenzo also transferred work and assets from Eastern to nonunion employer Continental, "thereby jeopardizing the job security of all Eastern employees as well as the survival of the airline as a separate entity."

At Continental, the unions had failed to support each other, and that had contributed significantly to their inability to resist Lorenzo's actions. The unions at Eastern were determined not to repeat that mistake. In particular, we at ALPA were convinced that if the [Machinists], the largest union at [Eastern], were to be unsuccessful in [their] collective bargaining efforts, then ALPA would have little chance of success in its own negotiations, which were pending at the same time.

Even if we accept Mr. Babbitt's affidavit at face value and conclude the sympathy strike furthered the Eastern pilots' collective bargaining efforts at Eastern, this would not, in itself, support a conclusion the Eastern sympathy strike would have ultimately "inure[d] to the benefit" of Mr. Lancaster's collective bargaining unit at United. *Lehnert*, 500 U.S. at 524, 111 S.Ct. at 1961. Notably, there is no indication in Mr. Babbitt's affidavit that because the *Eastern* pilots struck in sympathy with the *Eastern* Machinists, the *United* Machinists might one day strike in sympathy with the *United* pilots, thereby possibly improving their chances of obtaining concessions from *United*. Rather, the only testimony Mr. Babbitt gave in his affidavit suggesting the Eastern sympathy strike might inure to the benefit of Mr. Lancaster's collective bargaining unit was the following:

The Eastern Air lines strike was important to collective bargaining at all airlines, not merely Eastern. Lorenzo's success at cutting wages and eliminating the unions at Continental had a direct impact on the ability of ALPA to maintain or improve labor standards throughout the industry. The low-wage competition of Continental led to wage cutting on many other carriers, as well as the introduction of a reduced wage scale (called the "B scale") for newly hired pilots on most major air carriers. Indeed, the 1985 United strike resulted in large part from United management demanding a reduced wage scale similar to the "B scale" that Lorenzo had obtained at Continental. We knew that if Eastern were to go the way of Continental, the pressure on other carriers to reduce labor costs would be further intensified.

The mere possibility that an unfavorable ALPA *or Machinist Union* contract at Eastern might decrease costs at Eastern, cause Eastern to reduce fares, and ultimately force other carriers to reduce costs and fares at the expense of ALPA members is simply too tenuous. This chain of events could easily be influenced, and perhaps broken, by any number of factors, including the overall economy, trends in consumer and business spending and travel habits, whether Eastern chose to reduce fares or merely retain profits generated because of its increased profit margin, whether other airlines were able to remain competitive by offering better flight schedules and service or were actually forced to reduce fares, etc. We read *Lehnert* as requiring more than the speculative nexus ALPA asserts.

■ Mr. Babbitt's affidavit is the only evidence ALPA cites in its brief on appeal to support its contention it was entitled to summary judgment on the issue of whether the Eastern sympathy strike assessment was germane as a matter of law. ALPA's argument therefore stands or falls on this one affidavit, because without a specific reference in the brief on appeal, " 'we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury.' " *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1546 (10th Cir.1995) (quoting *Thomas v.*

*Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1025 (10th Cir.), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992)). Because Mr. Babbitt's affidavit is inadequate to establish the Eastern sympathy strike assessment was germane as a matter of law for the reasons stated in the preceding paragraph, we conclude it was error for the district court to grant summary judgment in favor of ALPA and United on Mr. Lancaster's Railway Labor Act and constitutional claims. *Thomas,* 968 F.2d at 1024 ("A movant need only point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law.... If a movant establishes its entitlement to judgment as a matter of law given uncontroverted, operative facts contained in the documentary evidence, summary judgment will lie."). Given this conclusion, we must also determine whether the district court erred when it denied Mr. Lancaster's cross-motion for summary judgment on his Railway Labor Act and constitutional claims on the ground the Eastern sympathy strike assessment was nongermane as a matter of law. As the nonmoving party, ALPA bore the burden of specifying evidence in the record sufficient to raise a genuine issue of material fact for trial. *Thomas,* 968 F.2d at 1024–1025. Not surprisingly, Mr. Babbitt's affidavit is the only evidence ALPA has identified in its brief on appeal to sustain this burden. As we have explained, this evidence is simply too tenuous to support a jury verdict that the Eastern sympathy strike assessment was germane under *Lehnert.* Mr. Lancaster is therefore entitled to summary judgment on his Railway Labor Act and constitutional claims.

### IV

ALPA and United remind us that even if we conclude the district court erred in granting summary judgment on the merits of Mr. Lancaster's Railway Labor Act and constitutional claims, "[w]e are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." *United States v. Sandoval,* 29 F.3d 537, 542, n. 6 (10th Cir. 1994) (quotations omitted). They first con-

tend they are entitled to summary judgment on Mr. Lancaster's constitutional claims because they are not state actors. This contention is unavailing. In *Hanson,* 351 U.S. at 232, 76 S.Ct. at 718, the Supreme Court agreed with the Supreme Court of Nebraska's holding that the adoption of union shop agreements, and ostensibly agency shop agreements as well, under § 2, Eleventh of the Railway Labor Act amounted to state action because Congress' enactment of § 2, Eleventh, " 'is a necessary part of every union shop contract entered into on the railroads ... for without it such contracts could not be enforced,' " *Hanson,* 351 U.S. at 232, 76 S.Ct. at 718.

> In other words, the federal statute is the source of the power and authority by which any private rights are lost or sacrificed. The enactment of the federal statute authorizing union shop agreements is the governmental action on which the Constitution operates, though it takes a private agreement to invoke the federal sanction.

*Id.* Because union and agency shop agreements have "the imprimatur of the federal law" upon them, companies and unions entering into such agreements are state actors. *Id.* The Court focussed on the Railway Labor Act's express preemption of state laws prohibiting union and agency shops. *Id.;* 45 U.S.C. § 152, Eleventh (authorizing union security agreements "[n]otwithstanding any other provisions of this chapter, or of any other statute or law of the United States, or Territory thereof, or of any State"); *Kolinske v. Lubbers,* 712 F.2d 471, 475 (D.C.Cir. 1983) (noting *Hanson* Court based its decision largely on the fact the Railway Labor Act preempts state law). The high court continued to treat unions and employers as state actors in *Ellis,* 466 U.S. at 455–57, 104 S.Ct. at 1895–97, its most recent Railway Labor Act decision involving a private-sector union.

We agree with ALPA's and United's contention that it is difficult to reconcile *Hanson* and *Ellis* with certain other high court decisions regarding state action. *See, e.g., Blum v. Yaretsky,* 457 U.S. 991, 1002–12, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982); *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 164–66,

98 S.Ct. 1729, 1737–39, 56 L.Ed.2d 185 (1978); *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 350–59, 95 S.Ct. 449, 453–58, 42 L.Ed.2d 477 (1974); *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 171–77, 92 S.Ct. 1965, 1970–74, 32 L.Ed.2d 627 (1972). Even in comparatively clear cut cases, "the question whether particular conduct is 'private,' on the one hand, or 'state action,' on the other, frequently admits of no easy answer," *Jackson,* 419 U.S. at 349–50, 95 S.Ct. at 452–53, and this case is no exception. Nevertheless, we are bound by *Hanson* and *Ellis* until and unless they are overruled. *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 1921, 104 L.Ed.2d 526 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of

overruling its own decisions."). We therefore adhere to the rule that unions and employers are state actors for the purposes of § 2, Eleventh, of the Railway Labor Act. *Accord, Pilots Against Illegal Dues,* 938 F.2d at 1127; *Beckett,* 59 F.3d at 1280 (triable issue whether ALPA violated the First Amendment by levying the Eastern sympathy strike assessment); *Crawford,* 992 F.2d at 1301 (rejecting ALPA's contention *Hanson* has been implicitly overruled).[2]

Second, ALPA and United contend Mr. Lancaster's Railway Labor Act and constitutional claims are barred by res judicata and/or waiver because he failed to raise them during arbitration. In the alternative, they contend even if the claims are not barred by res judicata, they cannot be raised in federal court because Mr. Lancaster failed to exhaust his nonjudicial remedies as to those claims.[3] Mr. Lancaster concedes he did not

---

**2.** Although *Hanson* made it clear unions and employers could violate a dissenting employee's right to due process under the Fifth Amendment by charging nongermane agency fees, because such charges would unduly interfere with the employees' protected "liberty" interest in earning a living, *Hanson,* 351 U.S. at 234–35, 76 S.Ct. at 719–20, neither *Ellis* nor *Lehnert* discuss this ground for relief. Although we find this omission rather conspicuous, we remain bound by *Hanson* and continue to apply the interpretation of the Fifth Amendment contained in that decision.

**3.** In June 1985, ALPA and United added a provision to their collective bargaining agreement requiring United to terminate any pilot who fails to pay agency fees. The Supplemental Agreement provided

 C. A protest by a pilot who is to be discharged as the result of an interpretation or application of the provisions of this Agreement shall be subject to the following procedures:

 1. A pilot who believes that the said provisions have not been properly interpreted or applied as they pertain to him, may submit his request for review in writing within ten (10) days after receipt of the notification from the Senior Vice President—Human Resources, as provided in paragraph C above. The request must be sent . . . to the Senior Vice President—Human Resources or his designee, who will review the protest and render a decision in writing, not later than ten (10) days following receipt of the protest.

 2. The Senior Vice President—Human Resources or his designee shall forward his decision to the pilot, with a copy to [ALPA]. . . . Said decision shall be final and binding on all

interested parties, unless appealed as hereinafter provided. If the decision is not satisfactory to either the pilot or [ALPA], then either may appeal within ten (10) days from the receipt of the decision, by filing a notice of appeal. Such notice shall be sent to the other party and the Company. . . . Appeal shall be directed to a Neutral Referee who shall be agreed upon by the pilot and [ALPA] within ten (10) days after receipt of the notice of appeal. . . . The hearing before the Neutral Referee shall be held as soon as possible and. . . . The decision of the Neutral Referee shall be final and binding on all parties to the dispute. . . .

ALPA and United later renewed the Supplemental Agreement, and it remained in force throughout the entire period relevant to this case.

In addition, ALPA revised its Policies and Procedures Applicable to Agency Fees in 1987 and distributed copies to United's nonmember employees. ALPA also attached copies to its annual Statements of Germane and Nongermane Expenses. The Policies and Procedures require ALPA to "prepare a 'Statement of Germane and Nongermane Expenses' (SGNE) which will disclose, in reasonable detail, the year's expenditures, segregating those that were germane to collective bargaining from those that were not." They also establish a nonjudicial procedure for nonmember employees to object to ALPA's designation of particular agency fees as germane or nongermane in the SGNE. Because, as we discuss in more detail *post,* ALPA did not include the Eastern sympathy strike assessment in the SGNE's for the relevant periods, the SGNE objection procedures in the Policies and Procedures Applicable to Agency Fees are irrelevant to this case, and the matter is governed instead by the arbitration provisions of the collective bargaining agreement, quoted *ante.*

raise these claims during arbitration, but contends he was not required to do so because the arbitrator lacked jurisdiction over them, and therefore it would have been futile to do so. In the alternative, Mr. Lancaster contends ALPA failed to provide him with sufficient information about the nature and purpose of the Eastern sympathy strike assessment, either in its SGNEs or otherwise, so that he could "present a meaningful case to the arbitrator" in support of his Railway Labor Act and constitutional claims.

■ The courts have had no small difficulty untying the Gordian knot binding the judicial and nonjudicial procedures for challenging the germaneness of agency shop assessments. The Railway Labor Act itself does not specifically require that unions establish nonjudicial procedures to resolve disputes regarding such assessments. The first indication such a requirement existed came in *Chicago Teachers Union Local No. 1 v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), in which the high court considered whether a public employees' union, the Chicago Teachers Union, had developed adequate procedural safeguards to minimize its infringement on dissenting nonmember employees' First Amendment rights. The Court held the union's procedure was inadequate in part because it did not provide for prompt, nonjudicial resolution of disputes before an impartial decision maker. *Id.* at 307, 106 S.Ct. at 1076. "Since the agency shop itself is 'a significant impingement on First Amendment rights,' *Ellis,* 466 U.S. at 455, 104 S.Ct. at 1896, the government and union have a responsibility to provide procedures that minimize that impingement and that facilitate a nonunion employee's ability to protect his rights." *Id.* In *Pilots Against Illegal Dues,* we assumed *Hudson* also applies to agency shop arrangements involving private-sector unions, but declined to decide the issue. *Pilots Against Illegal Dues,* 938 F.2d at 1132. We

now join our sister Circuits in holding *Hudson* applies in this context. *See Abrams,* 59 F.3d at 1379 & n. 7; *Crawford,* 992 F.2d at 1301.

Contrary to ALPA's and United's contention, and contrary to the language of the collective bargaining agreement, the arbitrator's decision is not "final and binding on all parties to the dispute," *i.e.,* it is not res judicata. Rather, the *Hudson* Court made it clear "[t]he arbitrator's decision would not receive preclusive effect in any subsequent ... action" asserting a constitutional violation, and ostensibly a Railway Labor Act violation as well, *Hudson,* 475 U.S. at 308 n. 21, 106 S.Ct. at 1077 n. 21, but that "the courts [would] remain available as the ultimate protectors of constitutional rights," and ostensibly the rights secured under the Railway Labor Act, *id.* at 307 n. 20, 106 S.Ct. at 1076 n. 20.

■ In *Hudson,* the high court gave no guidance on whether an objecting employee must exhaust the nonjudicial remedies available to him before suing in federal court.[4] The only discussion of this issue came in Justice White's brief concurrence, in which Chief Justice Burger joined. Justice White wrote:

> [A]s I understand the Court's opinion, the complaining nonmember need only complain; he need not exhaust internal union hearing procedures, if any, before going to arbitration. However, if the union provides for arbitration and complies with the other requirements specified in our opinion, it should be entitled to insist that the arbitration procedure be exhausted before resorting to the courts.

*Id.* at 311, 106 S.Ct. at 1078. The Courts of Appeals have since divided on the question. *Beckett v. Air Line Pilots Ass'n,* 995 F.2d 280, 285 (D.C.Cir.1993) (noting split but not deciding the issue). After remand from the

---

4. The high court also gave no guidance regarding the standard of review courts should use to evaluate an arbitrator's decision. ALPA draws our attention to an unpublished decision from the District Court for the District of Columbia holding courts should review an arbitrator's factual findings for clear error, just as they do when reviewing decisions of magistrates, see Fed. R.Civ.P. 53(e)(2), and review legal issues *de novo. Miller v. Air Line Pilots Ass'n, Int'l,* No. 91–3161, slip op. at 12 (D.D.C. Aug. 30, 1995). We have no occasion to decide the matter in this case, given that Mr. Lancaster concedes he failed to raise his Railway Labor Act and constitutional claims during arbitration, and hence there is no decision to review.

Supreme Court in *Hudson,* the Seventh Circuit held a dissenting employee must exhaust all available nonjudicial remedies provided those remedies are adequate under the criteria established by the Supreme Court. *Hudson v. Chicago Teachers Union,* 922 F.2d 1306, 1314 (7th Cir.), *cert. denied,* 501 U.S. 1230, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991). Although we have never squarely decided the issue, we expressed our general agreement with the Seventh Circuit's position in *Pilots Against Illegal Dues* by observing that "[t]he *Hudson* procedural scheme evidently contemplates that challenges to agency fee determinations will be reviewed initially through an arbitration procedure." *Pilots Against Illegal Dues,* 938 F.2d at 1133. The Sixth Circuit, however, struck down a union's requirement that dissenting employees exhaust nonjudicial remedies as a condition precedent to their right to file an action in federal court, because the requirement "unduly implie[d] a limitation" on the employees' constitutional rights. *Tierney v. City of Toledo,* 917 F.2d 927, 939–40 (6th Cir.1990).

We now conclude the Seventh Circuit's holding in *Hudson* was correct and adopt it as the law of this Circuit. First, because a unanimous Supreme Court joined Justice Stevens' opinion in *Hudson,* it is this opinion only that is binding on this court. *Accord, United States v. Harpole,* 263 F.2d 71, 80 (5th Cir.) (where the majority has spoken, dissenting opinions are "of course, entitled to no weight as a precedent"), *cert. denied,* 361 U.S. 838, 80 S.Ct. 58, 4 L.Ed.2d 78 (1959). Nevertheless, although we are not bound by the concurring opinion of Justice White, in which Chief Justice Burger joined, we view it as carrying the same precedential weight as Supreme Court dicta to the extent it is consistent with the majority opinion. As such, we will not disregard it without a significant reason for doing so. *Gaylor v. United States,* 74 F.3d 214, 217 (10th Cir.1996) ("this court considers itself bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements"); *Alston v. Redman,* 34 F.3d 1237, 1246 (3d Cir.1994) (although language in Supreme Court's opinion is dicta, "we

must consider it with deference, given the High Court's paramount position in our 'three-tier system of federal courts,' ... and its limited docket"), *cert. denied,* — U.S. —, 115 S.Ct. 1122, 130 L.Ed.2d 1085 (1995); *Hendricks County Rural Elec. Membership Corp. v. N.L.R.B.,* 627 F.2d 766, 768 n. 1 (7th Cir.1980) ("A dictum in a Supreme Court opinion may be brushed aside by the Supreme Court as dictum when the exact question is later presented, but it cannot be treated lightly by inferior federal courts until disavowed by the Supreme Court."), *rev'd. on other grounds,* 454 U.S. 170, 102 S.Ct. 216, 70 L.Ed.2d 323 (1981). We find no such reason here. Second, the practical appeal of the Seventh Circuit's approach is obvious and compelling. Were we to hold there is no exhaustion requirement, "the procedure spawned by the Supreme Court [in *Hudson* would be] largely a waste of time and money." *Bromley v. Michigan Educ. Ass'n.-NEA,* 843 F.Supp. 1147, 1153 (E.D.Mich. 1994). Furthermore, we would more often be forced to micromanage the fee calculation in every case challenging a union assessment, which "would place an overwhelming and unrealistic burden on the courts," *Hudson,* 922 F.2d at 1314, and force us to entangle ourselves in disputes which the union itself might have been able to resolve without judicial intervention, *Detroy v. American Guild of Variety Artists,* 286 F.2d 75, 79 (2d Cir.) ("The possibility that corrective action within the union will render a member's complaint moot suggests that, in the interest of conserving judicial resources, no court step in before the union is given its opportunity. Moreover, courts may find valuable the assistance provided by prior consideration of issues by appellate union tribunals."), *cert. denied,* 366 U.S. 929, 81 S.Ct. 1650, 6 L.Ed.2d 388 (1961).

Our conclusion that a dissenting employee must exhaust available nonjudicial remedies, provided they satisfy the criteria the high court announced in *Hudson,* is only the beginning of our inquiry. We must now determine whether a dissenting employee who, like Mr. Lancaster, has not fully exhausted the available nonjudicial remedies is barred from raising his unexhausted claims in feder-

al court. We took a very pragmatic approach to the question in *Pilots Against Illegal Dues.* In that case, ALPA failed to provide a nonjudicial procedure for challenging agency fees, as required under *Hudson,* for 1984. We held it would be "redundant ... to order the matter to be submitted to an arbitrator" because the district court had already considered and resolved the germaneness issue on the merits and there was no indication the dissenting employees had incurred damages because of the lack of arbitration. *Pilots Against Illegal Dues,* 938 F.2d at 1133. In *Beckett,* the District of Columbia Circuit cited *Pilots Against Illegal Dues* with approval and rejected ALPA's contention the plaintiff employees were barred from raising their unexhausted claims in federal court, because "[w]hile this position may have merit, to remand for arbitration at this late stage would only yield futile swink." *Beckett,* 59 F.3d at 1278 n. 3.

█ The clear teaching of *Pilots Against Illegal Dues* and *Beckett* is that an employee who fails to exhaust the nonjudicial remedies available to him is not absolutely barred from asserting his unexhausted claims in federal court, but that the courts have discretion to decide those claims on the merits under appropriate circumstances. There is nothing novel about this conclusion. It is well established that the courts have discretion to excuse an employee's failure to exhaust nonjudicial remedies before filing an action alleging breach of a collective bargaining agreement under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. *Clayton v. International Union,* 451 U.S. 679, 689, 101 S.Ct. 2088, 2095, 68 L.Ed.2d 538 (1981). In deciding whether to do so, courts should consider, among other things,

first, whether the union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; second, whether the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks ...; and third, whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim.

*Clayton,* 451 U.S. at 689, 101 S.Ct. at 2095. The courts also have discretion to waive the exhaustion requirement in actions by employees to determine their pension rights under the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a), *Communications Workers of America v. American Tel. & Tel. Co.,* 40 F.3d 426, 432 (D.C.Cir.1994) (citing cases), and in actions under § 101(a) of the Labor Management Reporting and Disclosure Act, commonly referred to as the Landrum–Griffin Act, 29 U.S.C. § 411(a), *see, e.g., Chapa v. Local 18,* 737 F.2d 929, 931 (11th Cir.1984); *Bright v. Taylor,* 554 F.2d 854, 860 (8th Cir.1977); *Simmons v. Avisco, Local 713,* 350 F.2d 1012, 1016 & n. 7 (4th Cir.1965) (noting ample precedent for excusing exhaustion requirement); *Detroy,* 286 F.2d at 81. There is also an extensive body of authority in the state courts holding there are exceptions to the exhaustion requirement in actions alleging a union breached its by-laws or constitution. Martin H. Malin, *Individual Rights Within the Union* 28–30 (1988) (summarizing exceptions and citing cases). We see no reason to apply a different rule in cases like the one now before us. *Accord Frandsen v. Brotherhood of Ry., Airline & S.S. Clerks,* 782 F.2d 674, 684–86 & n. 10 (7th Cir.1986) ("the exhaustion of intra-union remedies by a railroad employee is governed by the same general principles set forth by the Supreme Court in other labor cases.").

█ ▪ALPA and United urge us to conclude the Railway Labor Act itself precludes the courts from excusing a dissenting nonmember employee's failure to exhaust nonjudicial remedies. We reject this contention for a number of reasons. First, the issue in this case is not whether the Railway Labor Act requires objecting nonmember employees to exhaust available nonjudicial remedies, but whether such a procedural requirement is consistent with the First Amendment as interpreted in *Hudson.* Therefore, although we consider the statutory and federal common law governing the exhaustion of nonjudicial remedies in the labor context to be highly relevant, that law is not directly applicable to this case. Second, ALPA's and United's contention would overly limit the courts' authority, which would

conflict with the Supreme Court's designation of them as the "ultimate protectors of constitutional rights" in cases such as the one now before us. *Hudson,* 475 U.S. at 307 n. 20, 106 S.Ct. at 1076 n. 20. Third, ALPA's and United's position directly conflicts with the pragmatic, discretionary approach we used in *Pilots Against Illegal Dues* and that the District of Columbia Circuit used in *Beckett.* Finally, even if the Railway Labor Act's procedural requirements applied, ALPA's and United's contention would remain unavailing. The Railway Labor Act establishes a nonjudicial procedure for resolving disputes between an employee and a carrier that arise out of the interpretation or application of the collective bargaining agreement "concerning rates of pay, rules, or working conditions." 45 U.S.C. § 153, First (i); 45 U.S.C. §§ 181–185 (providing § 3 of the Railway Labor Act, 45 U.S.C. § 153, does not apply to air carriers but prescribing comparable procedures); *Frandsen,* 782 F.2d at 685; *Kaschak v. Consolidated Rail Corp.,* 707 F.2d 902, 904–905 (6th Cir.1983). Such disagreements are commonly referred to as "minor disputes." The board of adjustment has exclusive jurisdiction over minor disputes, *Slocum v. Delaware L. & W.R. Co.,* 339 U.S. 239, 244, 70 S.Ct. 577, 580, 94 L.Ed. 795 (1950), and "an employee may not forego resort to the Board and opt to have a dispute with a carrier considered, in the first instance, by a federal court." *Kaschak,* 707 F.2d at 905; *see Bowe v. Northwest Airlines, Inc.,* 974 F.2d 101, 103 (8th Cir.1992), *cert. denied,* 507 U.S. 992, 113 S.Ct. 1602, 123 L.Ed.2d 164 (1993). Under certain circumstances, however, courts may take jurisdiction over nonminor disputes without requiring exhaustion of nonjudicial remedies. *Frandsen,* 782 F.2d at 685. Although, as we discuss more fully *post,* the collective bargaining agreement applies to this dispute in the sense that it requires United to terminate nonmember employees who fail to pay chargeable assessments and gives the arbitrator jurisdiction to determine whether a given assessment is legally chargeable, the dispute actually arises not out of the collective bargaining agreement, but out of the Railway Labor Act and the federal Constitution. At least in this narrow context, we agree with the Seventh Circuit that a dispute arising out of the statutory and constitutional relationship between an employee and a carrier, rather than the collective bargaining agreement, is "by definition 'non-minor.'" *Frandsen,* 782 F.2d at 685. Although the adjustment board is "[a]n agency especially competent and specifically designated to deal with" minor disputes arising out of collective bargaining agreements, *Order of Ry. Conductors of America v. Pitney,* 326 U.S. 561, 567, 66 S.Ct. 322, 325, 90 L.Ed. 318 (1946); *see Slocum,* 339 U.S. at 243–244, 70 S.Ct. at 579–580, in cases like that now before us, which are governed by the statutes and Constitution of the United States, the adjustment board's expertise in such matters is not needed.

In light of the foregoing, the issue in this case is whether Mr. Lancaster's failure to exhaust available remedies should be excused. Mr. Lancaster contends his failure to exhaust should be excused because it would have been futile for him to raise his Railway Labor Act and constitutional claims during arbitration, given that the arbitrator lacked jurisdiction over his claims. This contention lacks merit for two reasons. First, although Mr. Lancaster's Railway Labor Act and constitutional claims are not minor disputes over which the *adjustment board* had exclusive jurisdiction, the *arbitrator* did indeed have jurisdiction over them. The question is not whether the dispute was minor, but whether Mr. Lancaster contracted to arbitrate his claims, because it is well established a party cannot be required to arbitrate a matter unless he has contracted to do so. *First Options of Chicago, Inc. v. Kaplan,* —— U.S. ——, ——, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995); *AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986). Although Mr. Lancaster is not a member of ALPA, the collective bargaining agreement, including the Supplemental Agreement governing agency fee arbitration, quoted in footnote 3 *ante,* is binding on him. Martin H. Malin, *The Legal Status of Union Security Fee Arbitration After Chicago Teachers Union v. Hudson,* 29 B.C.L.Rev. 857, 878 (1988) ("The collective

bargaining agreement ... binds all employees, regardless of membership status."). Mr. Lancaster does not argue to the contrary. The Supplemental Agreement specifically provides that "[a] protest by a pilot who is to be discharged as the result of an interpretation or application of the provisions of this Agreement shall be subject to" the arbitration procedures prescribed therein. The Supplemental Agreement requires United to terminate any pilot "who is required under this Agreement to make payment of a service charge." United obviously cannot terminate a pilot for failing to pay an assessment he is not legally required to pay. Thus, the arbitrator has the authority to determine whether the pilot can legally be required to pay the assessment in question under the Railway Labor Act and the Constitution. In our view, this language is unambiguous, and therefore we need look no further to determine its meaning. *See Volkman v. United Transportation Union*, 73 F.3d 1047, 1050 (10th Cir.1996) ("If the language of the [collective bargaining] agreement is unambiguous, it may be construed as a matter of law without resort to extrinsic evidence of intent."). Indeed, even if the Supplemental Agreement were susceptible of more than one reasonable interpretation, we would be required to choose an interpretation that would make the agreement constitutional. *Great Northern Ry. Co. v. Delmar Co.*, 283 U.S. 686, 691, 51 S.Ct. 579, 581, 75 L.Ed. 1349 (1931) ("where two constructions of a written contract are possible, preference will be given to that which does not result in violation of law"); *Moffat Tunnel Improvement Dist. v. Denver & Salt Lake Ry. Co.*, 45 F.2d 715, 733 (10th Cir.1930) ("it is fundamental that if a clause in a contract is fairly susceptible of two constructions, the court will not give it that construction which devitalizes the clause or the contract"), *cert. denied*, 283 U.S. 837, 51 S.Ct. 485, 75 L.Ed. 1448 (1931); 3 A. Corbin, *Corbin on Contracts* § 546, at 170 (1960) ("it is very commonly stated that when the terms of agreement have two possible interpretations, by one of which the agreement would create a valid contract and by the other it would be void or illegal, the former will be preferred") (footnote omitted). Unless ALPA's arbitration procedures provide a nonjudicial mechanism for dissenting nonmember employees to object to the chargeability of an assessment under the Railway Labor Act and the Constitution, they would run afoul of *Hudson*. We would therefore be required to interpret it as giving the arbitrator the authority to decide such issues. Second, even if the arbitrator had lacked jurisdiction to provide Mr. Lancaster complete relief as to all of his claims, Mr. Lancaster would not necessarily be excused from presenting all of his claims to the arbitrator. *Frandsen*, 782 F.2d at 683. An employee should ordinarily place his entire case before the arbitrator because doing so "may produce genuine compromise" between the employee and the union despite the arbitrator's inability to provide complete relief, because it may persuade the employee "that a claim is not so strong as it might have seemed" and dissuade him from undergoing the expense of litigation, and because it may, if the procedure is perceived as fair, "have a conciliatory or therapeutic value that lessens the employee's perceived need to file suit." *Id.*

■■■ Mr. Lancaster also contends he should be excused from the exhaustion requirement because ALPA failed to provide him with sufficient information about the nature and purpose of the Eastern strike assessment, either in its SGNE or otherwise, so that he could "present a meaningful case to the arbitrator" in support of his Railway Labor Act and constitutional claims. Both the First Amendment and "[b]asic considerations of fairness" require unions to provide employees with enough information so that they can determine whether to object to a given assessment. *Hudson*, 475 U.S. at 306–07, 106 S.Ct. at 1075–76; *Pilots Against Illegal Dues*, 938 F.2d at 1132. "The Union need not provide nonmembers with an exhaustive and detailed list of all its expenditures, but adequate disclosure surely would include major categories of expenses." *Hudson*, 475 U.S. at 307 n. 18, 106 S.Ct. at 1076. To illustrate the degree of specificity required, the high court stated that in order to provide adequate notice regarding a union's payment to its affiliated labor organizations, the notice must, at the very least, contain "either a showing that none of it was used to

subsidize activities for which nonmembers may not be charged, or an explanation of the share that was so used." *Id.* In a related context, one Court of Appeals has held that *Hudson* requires unions to inform employees that they have a right to object to an agency fee under federal law, not merely under applicable union policies, and to correctly inform the employees what agency fees are chargeable under the applicable federal law. *Abrams v. Communications Workers of America,* 59 F.3d 1373, 1379–1380 (D.C.Cir. 1995); *see also Tierney v. City of Toledo,* 824 F.2d 1497, 1506 (6th Cir.1987) ("The plan is also procedurally deficient ... because it does not contain adequate constitutional procedures enabling non-members to make their objections known. A non-union member reading the proposed rules would simply not know how to make a prompt and effective objection.").

ALPA concedes it did not account for the Eastern sympathy strike assessments in its SGNEs for 1989 and 1990. It contends, however, that "[n]onmembers did not require ... a description of the Eastern Assessment because, beginning in May 1989, ALPA sent each nonmember monthly statements stating, as a separate item, exactly how much the nonmember owed for the assessment." This monthly statement, however, described the charge merely as the "EAL ASSESSMENT" and specified the month to which the assessment applied. The statement gave no indication whether the assessment was germane to collective bargaining. ALPA also asserts it "repeatedly informed pilots, including [Mr. Lancaster], that the Eastern Assessment would fund strike benefits to the Eastern pilots and that ALPA considered the benefits (as well as expenses relating to the Eastern strike) to be chargeable." We view this contention as specious. ALPA provided this assertedly constitutionally sufficient notice to nonmember employees not through an official notice summarizing the purpose and germaneness of the assessment and instructing them how and when to object, but through a series of short news blurbs in *Air Line Pilot* magazine. These news blurbs fall well short of the constitutional and "fairness" requirements of *Hudson,* and, perhaps more glaringly, fall well short of the thorough and carefully crafted notice contained in ALPA's SGNEs for the relevant periods. Because ALPA failed to comply with the notice requirement of *Hudson,* it would be unfair to penalize Mr. Lancaster for failing to comply with *Hudson's* requirement that he exhaust available nonjudicial remedies before bringing his action in federal court.

 Third, ALPA and United contend Mr. Lancaster is not entitled to relief because he failed to notify ALPA of his objection to the sympathy strike assessment as required in its "Policies and Procedures Applicable to Agency Fees." We have held, however, that ALPA's Policies and Procedures do not apply to the Eastern strike assessment, but only to assessments accounted for in its SGNEs, and that the procedures contained in the collective bargaining agreement apply instead. *See* footnote 3, *ante.* Even if we recast ALPA's contention as being that Mr. Lancaster failed to provide it with adequate notice of his objection by not raising his Railway Labor Act and constitutional claims during arbitration in accordance with the collective bargaining agreement, it remains unavailing. It is true that a dissenting employee must notify the union of his objection. *Allen,* 373 U.S. at 118–19, 83 S.Ct. at 1161–62; *Street,* 367 U.S. at 774, 81 S.Ct. at 1802. However, "[t]he nonmember's 'burden' is simply the obligation to make his objection known." *Hudson,* 475 U.S. at 306 n. 16, 106 S.Ct. at 1076 n. 16. The Supreme Court addressed the notice requirement in *Abood v. Detroit Board of Education,* 431 U.S. 209, 241, 97 S.Ct. 1782, 1802, 52 L.Ed.2d 261 (1977), in which the Michigan Court of Appeals held the objecting employee plaintiffs were not entitled to recover any portion of their agency fees used to further the union's political goals because they had failed to allege that they notified the union of the political candidates and issues to which they objected. *Abood,* 431 U.S. at 215, 97 S.Ct. at 1789. The Supreme Court disagreed and held:

[I]n holding that as a prerequisite to any relief each [objecting employee] must indicate to the Union the *specific* expenditures to which he objects, the Court of Appeals ignored the clear holding of *Allen.* As in

*Allen,* the employees here indicated in their pleadings that they opposed ideological expenditures of any sort that are unrelated to collective bargaining. To require greater specificity would confront an individual employee with the dilemma of relinquishing either his right to withhold his support of ideological causes to which he objects or his freedom to maintain his own beliefs without public disclosure. It would also place on each employee the considerable burden of monitoring all of the numerous and shifting expenditures made by the Union that are unrelated to its duties as exclusive bargaining representative.

*Abood,* 431 U.S. at 241, 97 S.Ct. at 1802 (emphasis in the original). Mr. Lancaster identified the assessment to which he objected—the Eastern sympathy strike assessment—in his federal complaint. Therefore, it would seem, under *Abood,* his failure to notify ALPA of his objection during arbitration, in itself, does not bar his action in federal court.

 There is one crucial distinction between *Abood* and the case now before us: the union in *Abood* had not established a nonjudicial procedure for challenging agency fees at the time the federal complaint was filed, *Abood,* 431 U.S. at 240 & n. 41, 97 S.Ct. at 1802 & n. 41, while ALPA did so in the collective bargaining agreement. A number of post-*Hudson* decisions have held dissenting employees must notify the union of their objection *before* filing suit if such a procedure is in place. *See, e.g., Lowary v. Lexington Local Bd. of Educ.,* 903 F.2d 422, 430 (6th Cir.) ("Normally, assuming valid objection procedure, dissent will not be presumed—it must be affirmatively asserted to the union."), *cert. denied,* 498 U.S. 958, 111 S.Ct. 385, 112 L.Ed.2d 396 (1990). We agree that if the union establishes a constitutionally adequate objection procedure, which it must after *Hudson,* and the procedure requires employees to notify the union of their objection within a specific time or lose the right to take advantage of it, the employee must either comply or risk dismissal of a subsequent federal action for failure to exhaust nonjudicial remedies. To borrow a phrase from then Justice Rehnquist, dissenting employees "must take the bitter with the sweet." *Ar-*

*nett v. Kennedy,* 416 U.S. 134, 154, 94 S.Ct. 1633, 1644, 40 L.Ed.2d 15 (1974) (plurality opinion of Rehnquist, J.). In all events, however, an employee is not obligated to comply with the union's notice requirement until and unless the employee himself receives adequate notice under *Hudson. Weaver v. University of Cincinnati,* 970 F.2d 1523, 1532 (6th Cir.1992) ("Until *Hudson's* requirements are satisfied, an employee who does not object to paying for nonchargeable items will be allowed subsequent opportunities to object."), *cert. denied,* 507 U.S. 917, 113 S.Ct. 1274, 122 L.Ed.2d 668 (1993); *Lowary,* 903 F.2d at 430 (employee's failure to object excused because union's procedures were inadequate under *Hudson* ); *Tierney,* 824 F.2d at 1506 (procedure violated *Hudson* in part because it requires members "to object ... whether or not there has been a constitutionally adequate disclosure"). Because Mr. Lancaster did not receive adequate notice under *Hudson* before he began pursuing his nonjudicial remedies, he is excused from exhausting ALPA's nonjudicial procedures, including the requirement he notify the union of his objection before filing suit.

 Finally, ALPA and United contend Mr. Lancaster's claims are barred by the applicable statute of limitations, because his cause of action accrued in May 1989, but he did not file his action in district court until December 1993. The six-month statute of limitations governing actions for breach of the duty of fair representation applies to actions under § 2, Eleventh, of the Railway Labor Act and the First and Fifth Amendments. *Pilots Against Illegal Dues,* 938 F.2d at 1134; *Crawford v. Air Line Pilots Ass'n. Int'l.,* 870 F.2d 155, 159 (4th Cir.1989), *aff'd,* 992 F.2d 1295, 1302 (4th Cir.1993) (en banc). We stated in *Pilots Against Illegal Dues* that the limitation period begins to run when the objecting employee is "in possession of the facts underlying a possible claim against the union." *Pilots Against Illegal Dues,* 938 at 1134. Reading *Pilots Against Illegal Dues* together with *Hudson's* requirement that unions provide nonmember employees with enough information that they can determine whether to object to a given assessment, *Hudson,* 475 U.S. at 306–307,

106 S.Ct. at 1075–1076, and our conclusion *ante* that an employee is not required to pursue nonjudicial remedies until and unless he receives constitutionally sufficient notice under *Hudson,* we conclude the statute of limitations period does not begin to run until the employee receives such notice. If the objecting employee thereafter pursues his nonjudicial remedies in good faith, the limitations period is tolled until the nonjudicial proceedings are completed. *Crawford,* 870 F.2d at 159; *see Volkman,* 73 F.3d at 1054 ("ordinarily, a plaintiff must exhaust internal union appeals before filing suit, and the statute of limitations is tolled during those appeals"); *Lucas v. Mountain States Tel. & Tel.,* 909 F.2d 419, 421–422 (10th Cir.1990) ("in duty-of-fair-representation cases in which the alleged breach of duty arises outside the context of processing a grievance, courts have held that accrual of such a claim can be tolled by an employee's good faith attempt to exhaust the grievance procedures"). This is so even if the employee's arbitration claim was futile because the arbitrator lacked authority to provide complete relief. *Frandsen,* 782 F.2d at 681–84 (7th Cir.1986). Thus, even if we accept ALPA's and United's contention the limitation period began running in May 1989, it was tolled until July 1993, when the arbitrator issued his decision, and Mr. Lancaster's federal action was timely.[5]

## V

For the reasons stated, the judgment of the district court is **REVERSED** and the cause is **REMANDED** for further proceedings consistent with this opinion.

---

[5]. Neither ALPA nor United contend Mr. Lancaster acted in bad faith or that his grievance was untimely under the procedures outlined in the collective bargaining agreement. We therefore express no opinion whether the limitation period would have been tolled under such circumstances.